**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                      No. CR 12-2060 JB

ROBERT CHAVEZ,

       Defendant.

<u>**MEMORANDUM OPINION AND ORDER**</u>

**THIS MATTER** comes before the Court on the Defendant's Motion to Suppress Illegally Acquired Evidence and Memorandum in Support of Motion to Dismiss, filed December 21, 2012 (Doc. 28)("Suppression Motion").  The Court held an evidentiary hearing on February 5, 2013.  The primary issues are: (i) whether the Court should find as credible the assertions of Justin Orphan, the third party on whose consent law enforcement officers relied in making entry into the home in which the gun that Defendant Robert Chavez is alleged to have possessed was found, that he did not give the officers consent to enter, or whether the Court should rather find as credible the testimony of the multiple officers that Orphan provided consent;  (ii) whether, if the Court finds that Orphan gave consent, his consent was voluntary and intelligent, or rather whether it was impliedly or expressly coerced or made under duress; and (iii) whether Orphan had apparent or actual authority to consent to the officers' entry into 1301 Pear Grove Lane in Farmington, New Mexico -- Chavez' residence.  The Court will deny the Suppression Motion. The Court finds that, because Orphan was previously untruthful when he provided self-serving statements to an officer at the scene of a burglary for which he was later convicted, and because multiple officers confirm that Orphan provided Agent Frank Barahona, a Homeland Security

Investigator, consent to enter the house in search for Chavez and Emily Bosco, the officers'

testimony is more credible than Orphan's and that Orphan provided Barahona with such consent.

Because there is no evidence that Barahona was coercive in his conduct, tone, or language while

asking Orphan for consent to search the home for Chavez and Bosco, and because the

circumstances indicate that Orphan was not otherwise under duress, the Court concludes that

Orphan's consent was voluntary, intelligent, and not made pursuant to coercion or duress.  The

Court also finds that, because Orphan was running into the home when police arrived on scene,

and because he not only confirmed with Barahona that he lived there, but also told him that he

was living there with his girlfriend, Bosco, and had been for three to four months, the officers

reasonably believed that Orphan had mutual access to the property and control over it, and thus

reasonably and lawfully relied on Orphan's apparent authority to consent to enter the home.  The

Court will therefore not suppress the evidence found within home after the lawful entry.

## FACTUAL BACKGROUND

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its

essential findings on the record when deciding a motion that involves factual issues.  See Fed. R.

Crim. P. 12(d) ("When factual issues are involved in deciding a [pretrial] motion, the court must

state its essential findings on the record.").  This Memorandum Opinion and Order's findings of

fact shall serve as the Court's essential findings for rule 12(d) purposes.  The Court makes these

findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a

judge to decide preliminary questions relating to the admissibility of evidence, including the

legality of a search or seizure, and the voluntariness of an individual's confession or consent to

search.  See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982)("[U]nder Rule[]

104(a) . . . , the district court 'is not bound by the Rules of Evidence except those with respect to privilege.'")(quoting United States v. Matlock, 415 U.S. 164, 174 (1974)).  In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court.  See Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible.  In so deciding, the court is not bound by evidence rules, except those on privilege.").  Thus, the Court may consider hearsay in ruling on a motion to suppress.  See United States v. Merritt, 695 F.2d at 1269 ("The purpose of the suppression hearing was, of course, to determine preliminarily the admissibility of certain evidence allegedly obtained in violation of defendant's rights under the Fourth and Fifth Amendments. In this type of hearing the judge had latitude to receive it, notwithstanding the hearsay rule."); United States v. Garcia, 324 F. App'x 705, 708 (10th Cir. 2009)(unpublished)[1]("We need not resolve whether Crawford[ v. Washington, 541 U.S. 36 (2004)]'s[2] protection of an accused's Sixth Amendment confrontation right applies to suppression hearings, because even if we were to assume this protection does apply, we would

---

[1] United States v. Garcia is an unpublished opinion, but the Court may rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored . . . .  However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision."  United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court finds that United States v. Garcia, and the other unpublished opinions on which the Court relies in this Memorandum Opinion and Order, have persuasive value with respect to material issues, and will assist the Court in its disposition of this memorandum opinion and order.

[2] Crawford v. Washington stands for the proposition that out-of-court statements against an accused are inadmissible at trial unless the witness is unable to testify and the defendant had a previous opportunity to cross-examine the witness.  See 541 U.S. at 53-54.

conclude that the district court's error cannot be adjudged 'plain.'");  United States v. Ramirez, 388 F. App'x 807, 810 (10th Cir. 2010)("It is beyond reasonable debate that Ramirez's counsel were not ineffective in failing to make a Confrontation Clause challenge to the use of the confidential informant. The Supreme Court has not yet indicated whether the Confrontation Clause applies to hearsay statements made in suppression hearings.").  Cf. United States v. Hernandez, 778 F. Supp. 2d 1211, 1226 (D.N.M. 2011)(Browning, J.)(concluding "that Crawford v. Washington does not apply to detention hearings").

1.      On April 3, 2012, a joint operation -- "Operation Forsaken" -- of the Farmington Police Department ("FPD") and of the United States Department of Homeland Security sought to arrest several individuals who had outstanding warrants.  Transcript of Hearing at 5:20-24 (taken Feb. 5, 2013)(Rowley, Spruell)("Feb. 5 Tr.")[3]("[O]peration forsake[n] . . . was basically a warrant roundup that we put together and [] focused on active gang members and . . . associates who had current outstanding warrants.").  See Feb. 5 Tr. at 8:17-23 (Rowley, Spruell)(Q: "On what date did you begin operation forsake[n]?." A: "The actual operation kicked of[] [on April] the 2nd . . . and then on the 3rd we actually went out to start contacting people and trying to make the arrests.");  id. at 98:25-9:1 (Spruell)("[W]e were in a partnership with Homeland Security.").

2.      The FPD and Homeland Security were conducting a joint arrest sweep -- also known as a "joint warrant roundup."  See Feb. 5 Tr. at 5:22-24 (Spruell).

3.      The FPD received information that individuals with warrants for drugs trafficking

---

[3] The Court's citations to the transcripts of the hearings refer to the court reporter's original, unedited versions.  Any final transcripts may contain slightly different page and/or line numbers.

were at 1301 Pear Grove Lane.  <u>See</u> Feb. 5 Tr. at 7:1-20 (Rowley, Spruell)(Q: "What . . . connection do . . . Edd[ie] [Santiesteban] and Randy McK[enzy have]?"  A: "Both of these subjects . . . had warrants at the time . . . . [And] we received a tip, anonymous tip, that they were on Pear[] [Grove] . . ." "1301 Pear[] [Grove] Lane matched the criteria [of the description from the tip].");  <u>id.</u> at 73:12-24 (De la Garza, Barahona)("[T]here were two targeted individuals.  One by the last name Web[b], and the other one was [Santiesteban].").

4.     The Operation Forsaken went to the neighborhood of 1301 Pear Grove.  <u>See</u> Feb. 5 Tr. at 9:25-10:7 (Rowley, Spruell)(Q: "So on Tuesday of the operation, which home in Farmington did you go to first?" A: "In Farmington, well, we . . . went to a couple of houses before we went to the Pear[] address."  Q: "What Pear[] address are you referring to?"  A: "It's 1301 Pear[].").

5.     The FPD was familiar with 1301 Pear Grove as having been the subject of multiple calls and police interactions in the past.  <u>See</u> Feb. 5 Tr. at 41:5-42:24 (Rowley, Spruell)(testifying that Spruell is familiar with 1301 Pear Grove from having been called there "several times" and "contacting either people who are affiliated with narcotic use, selling drugs," and that he does not "always contact the same people at that residence").

6.     Chavez' residence is at 1301 Pear Grove.  <u>See</u> Feb. 5 Tr. at 93:17-94:2 (De la Garza, Orphan)(in response to Mr. De la Garza's asking Orphan what his relationship is with Chavez, and why he was at 1301 Pear Grove when police searched the residence, Orphan stated that the house is "Robert's");  <u>id.</u> at 94:22-95:1 (Orphan)(noting that Chavez made an arrangement with Bosco "where he had just given her a place of residence . . . .");  <u>id.</u> at 95:54-25 (De la Garza, Orphan)(Q: "[T]he property is 1301 Pear[] [Grove]; is that correct?"  A: "Yes.").

7.      The joint operation did not have an arrest warrant for Chavez and did not have a warrant to search Chavez' residence.  See Feb. 5 Tr. at 17:17-19:6 (Rowley, Spruell)(explaining that they stopped the search and "appl[ied] for a search warrant for the house" upon finding drugs and a gun in the house); id. at 28:19-29:3 (De la Garza, Spruell)(Officer Travis Spruell, a FPD officer involved in the joint task force, admitting on cross-examination that, when entering the home on April 3, 2012, "there was no arrest warrant for Mr. Chavez," and "there wasn't a search warrant to enter the property either").

8.      The Homeland Security and FPD officers surrounded and approached Chavez' residence.  See Feb. 5 Tr. at 97:1-4 (Orphan)("Saw the vehicles coming from the south or there was one vehicle coming from the south, and looked up the street and there was two vehicles coming in formation from that from the north."); id. at 97:4-6 (Orphan)("[They] were coming from the driveway back into the yard, and I turned around and closed the gate after we [realized] that we were probably being raided . . . .").

9.      When officers arrived at first approached 1301 Pear Grove, they observed a relatively small prefabricated home with two men, later identified as Michael Crain and Justin Orphan, standing outside.  See Feb. 5 Tr. 12:14-18 (Spruell)("[A]s we pulled in we saw a gathering of people outside."); id. at 13:16-19 (Spruell)("The individuals -- this is a grass area at the house . . . . They were not on the porch. They were in the grass [area] somewhere around here."); id. at 96:10-16 (De la Garza, Orphan)(Q: "[D]id you see law enforcement pull up to the property?" A: "I saw SUV's merging on the property . . . . I was there, a friend of mine had [] come by[,] Michael Crane[,] and we are working out in the driveway . . . .").

10.     When officers pulled up the address and got out of their vehicles, Crain ran away

in the opposite direction of the officers.  See Feb. 5 Tr. at 12:14-14:4 (Spruell, Rowley)("As we approached . . . . [a]s soon as we stepped out, one -- one male subject, a man, took off -- he turned and ran in the opposite direction of us."); id. at 97:1-10 (Orphan)("[I] saw the vehicles coming . . . Michael had ran around the side of the trailer and tried to exit outside the side of the residence.").

11.    Orphan was in the driveway and not in the house.  See Feb. 5 Tr. at 96:10-16 (De la Garza, Orphan)(Q: "[D]id you see law enforcement pull up to the property?" A: "I saw SUV's merging on the property . . . . I was there, a friend of mine had [] come by[,] Michael Crane[,] and we are working out in the driveway . . . .").

12.    Orphan was an occasional visitor to the 1301 Pear Grove premises,[4] as his girlfriend and the mother of his children, Erica Bosco, had a living arrangement with Chavez in which Chavez permitted Bosco and Orphan to stay there for periods of time.  See Feb. 5 Tr. at 94:1-9 (De la Garza, Orphan)("We had stayed off and on at Robert's for three to four months previous to April . . . .  It wasn't a permanent residence for [myself in the way that] it was [a] living arrangement with Erica and Mr. Chavez."); id. at 95:2-9 (De la Garza, Orphan)("[W]e'd stay sometimes [a] couple[,] two to three days.  It [] depends it was [] kind of broken up because like I said we had to make prior arrangements with Robert . . . .").

---

[4]Although the United States in its United States' Response to Defendant's Motion to Suppress, filed January 4, 2013 (Doc. 31), asserts that "Orphan said he did, and had lived there for three months," Orphan testified that he was only an occasional visitor to the premises and stayed at Chavez' home "off and on."  Tr. at 94:1-2 (Orphan).  Although Special Agent Frank Barahona, HSD, testified that Orphan answered "yes" when Barahona asked him if he lived there, the Court finds that this answer is consistent with Orphan's staying there at the time.  Feb. 5 Tr. at 59:19-21 (Barahona).  Barahona never testified that he asked, or that Orphan ever stated, that he owned the home or that it was his residence.  The Court thus finds that Orphan was an occasional resident guest at 1301 Pear Grove.

13.     Orphan stored "a few articles of clothing" at the premises.  Feb. 5 Tr. at 95:16 (Orphan).[5]

14.     Orphan did not store any other possessions there.  <u>See</u> Feb. 5 Tr. at 110:3-4 (Pflugrath, Spruell)(indicating that he does not have knowledge of any "toiletries" found in the room in which Orphan was staying).

15.     Orphan did not have free access to the premises.  <u>See</u> Feb. 5 Tr. at 94:12-14 (De la Garza, Orphan)(Q: "Could you go to the residence a[t] anytime you wanted to?" A: "No. We had to make arrangement with Robert and make [sure] he was there.").

16.     Orphan was not allowed on the premises alone, but could enter only when one of the actual residents was present and allowed him to enter.  <u>See</u> Feb. 5 Tr. at 96:2-6 (De la Garza, Orphan)(Q: "Did you have the ability to go pretty much at your leisure or when you wished to [Chavez'] property?" A: "Not without consent from Robert.  Robert had to be there or sometimes [P]age [Vaughn] would be there, and if we could call ahead and make sure someone was there then we were able to go there.").

17.     Orphan had no keys.  <u>See</u> Feb. 5 Tr. at 94:10-11 (De la Garza, Orphan)(Q: "Did you have a key to the residence?" A: "No.").

18.     Orphan paid no rent.  <u>See</u> Feb. 5 Tr. at 94:22-93:1 (De la Garza, Orphan)("It was . . . an arrangement between her and Robert where he had just given her a place of residence, a place to stay, and there was no -- no lease or monetary exchange . . . . It was more of a favor . . . .").

---

[5]Chavez argues that Orphan did not store clothing there, but Orphan testified that he kept some clothes there.  Because Chavez did not testify at the hearing, Orphan's testimony is uncontroverted and the Court thus finds that Orphan stored clothing there.

19.     When the officers identified themselves, Crain immediately ran into the backyard, and several officers, including Special Agent Jake Dye, HSD, and FPD Officer David Rock, gave chase.  See Feb. 5 Tr. at 125:4-12 (Pflugrath, Rock)(Q: "Officer [R]ock, what were you doing when the other officers were making entry?" A: "[T]here were two male subjects in the front yard and one of them ran . . . and I chased after him and caught him . . . . [It was] Michael [Crain]."); Transcript of Hearing at 107:25-108:6 (taken Feb. 6, 2013)("Feb. 6 Tr.")(Dye)("I jumped out of the vehicle, exited the back, and I ran after the individual that had gone to the Back.  I know that later on Dave [R]ock . . . jumped over the fence and then we met -- we met Mr. [Crain] essentially in that area . . . .").[6]

20.     Crain was then placed under arrest on an outstanding warrant.  See Feb. 5 Tr. at 125:8-14 (Rock, Pflugrath)("I chased after [Crain] and caught him in the backyard . . . ." Q: "He was arrested?" A: "Yes, he had . . . two warrants for his arrest.").

---

[6]Chavez contends that the versions of events that Dye and Rock submitted in their efforts to establish probable cause for issuance of an arrest warrant for Chavez are so materially divergent as to be without credibility.  Chavez argues that Dye's assertion that Orphan consented to entry into the residence where they found Chavez asleep in his bedroom is completely at odds with Rock's sworn statement that Chavez came to the door and agreed to allow the officers to enter.  Chavez maintains that, because Rock's statements directly contradict Dye's statements, they are unworthy of credence and can be given no weight.  Chavez argues that the Court cannot give either statement credence and urges the Court to disregard both statements.  In his statement of probable cause, Rock does not state that Chavez came to the door and agreed to let the officers enter.  Rather, because Rock was not there when the officers made entry into the house, Rock provides a short statement that the other agents knocked and contacted individuals.  He also states that Chavez agreed to let officers search his room.  See Ex. A3 ("The other Agents knocked on the front door and contacted several other people in the house. . . .  Chavez gave us consent to search his room.")(emphasis added).  While Rock's statement that the other agents knocked is inconsistent with the testimony at trial that the officers yelled multiple times and then entered when no one came to the door, importantly, he does not state that a particular individual came to the door and gave consent to enter, or that he knocked and then was granted permission.  The Court thus concludes that Rock's statement does not contradict the hearing testimony and will not disregard either statement.

21.     Orphan took several steps towards the open front door, when Barahona ordered Orphan to stop.  <u>See</u> Feb. 5 Tr. at 53:21-55:9 (Barahona)("We approached the house . . . . two subjects started fleeing . . . one toward the back of the trailer park . . . and another one going towards the front of the house. . . .  Subject number two was going towards the house. I [] parked the vehicle . . . [and] I yelled 'police stop.' He did not stop.").

22.     After Orphan attempted to go into the house, the officers approached 1301 Pear Grove in a threatening manner and with guns drawn.  <u>See</u> Feb. 5 Tr. at 56: (Barahona, Rowley)("Because I noticed that subject number two was not stopping . . . I engaged the subject by yelling police stop."  Q: "Where was your weapon?" A: "At this point I had high ready which is pretty much aiming at him because I do[] not know if the subject had a firearm or if he was going to try to get a firearm to engage it against me.").

23.     Barahona ordered Orphan to get onto his knees with his hands up.  <u>See</u> Feb. 5 Tr. at 57:4-9 (Rowley, Barahona)(Q: "Where were his hands at this point?"  A: "His hands were up. . . . [T]hen I asked the subject to get on his knees so that way I could start doing a pat-down."); <u>id.</u> at 58:9-16 (Rowley, Barahona)(Q: "What [] was your tone of voice [while] you were directing [Orphan] to get on his knees . . . . [and] before when he was [] on his knees . . . ?" A: "It was authoritative[.] I was using an officer presence type of [tone] to make sure that he knew I was a police officer and was giving some directions and guidelines.").

24.     Orphan complied with Barahona's orders; specifically, Orphan stopped, put his hands up, walked backwards to Barahona, and got on his knees.  <u>See</u> Feb. 5 Tr. at 56:17-57:4 (Barahona, Rowley)(explaining that, upon Barahona's second command to stop, "he did notice that my gun was up[,] he did stop . . . . I asked the subject to come towards me walking

back[wards] []. . . . [He] started walking [to]w[a]rds me backwards . . . . His hands were up"); id. at 57:7-8 (Barahona)("[T]hen I asked the subject to get on his knees so that way I could start doing a pat-down.").

26.     Because of Orphan's attempt to flee, and because of the suspicion that he might be one of the individuals involved in drug trafficking, Barahona patted him down for weapons. See Feb. 5 Tr. at 57:7-21 (Barahona, Rowley)(stating that Barahona patted down Orphan "for officer safety reasons . . . primarily to look for anything that [might] harm myself . . . . and also looking for firearms. . . .").

26.     Barahona secured Orphan with handcuffs.  See Feb. 5 Tr. at 57:19-20 (Rowley, Barahona)(Q: "What if anything did you find in his pockets?"  A: "I found nothing that would harm me so that's when I secured the [] subject into handcuffs.").

27.     After Barahona concluded the pat-down, he allowed Orphan to stand.  See Feb. 5 Tr. at 58:2-8 (Rowley, Barahona)(Q: "So what did you do[] after this pat-down was complete?" A: "I then took physical hold of the subject . . . , I lifted him up . . . ." );  id. at 98:13-21 (De la Garza, Orphan)(Orphan testifying that when officers arrived they "told me to get down on m[y] knees . . . .  After a few moments . . . they moved me . . .").

28.     Barahona then had Orphan sit down on the ground outside of the home with his back against a chain link fence.  See Feb. 5 Tr. at 58:5-7 (Barahona)("I lifted him up and [] walked him to towards this inner [fence] area so I can sit him down so he can sit against the [fence] . . . ."); id. at 63:16-23 (Rowley, Barahona)(Barahona testifying that he "leaned [Orphan] up against a fence . . . a chain-link fence"); id. at 98:20-21 (Orphan)("After a few moments, they handcuffed me and moved me over to the fence line."); Feb. 6 Tr. at 63:1-3 (Rowley,

Kepf)(stating that the other officers in the front yard "were engaged with the male that was on the fence").

29.     During and after the pat-down, Barahona kept his firearm on secured to his side and out of his hands.  See Feb. 5 Tr. at 57:10-11 (Barahona, Rowley)(in response to Rowley's question where Barahona's weapon was while performing the pat-down, Barahona answered: "At this time my firearm was secured to the side").

30.     Special Agent Abby Kepf, HSD, who was nearby, kept her firearm in a ready position.  See Feb. 5 Tr. at 66:4-16 (Barahona, Rowley)(testifying that "two other agents were in the area" when Barahona was interrogating Orphan, one of which was agent Kepf, and that their weapons "were at the down[-]ready [position] . . . ." Q: "D[id] they ever point their weapons at Mr. Or[phan] as you were speaking?" A: "No.").

31.     While Orphan was sitting against an exterior fence outside 1301 Pear Grove, Barahona asked Orphan where he lived, and he pointed with his head at the home on the property.  See Feb. 5 Tr. at 59:19-20 (Barahona)("I asked Mr. Orphan where he lived.  He pointed towards the porch [] area and also the trailer."); id. at 108:8; 108:14 (Pflugrath, Spruell)(testifying that Spruell asked "where Mr. Orphan lived," and Orphan "pointed to the window").

32.     When Barahona him again "you live here?" Orphan responded yes.  Orphan said he had lived there for three months.  Feb. 5 Tr. at 59:20-21 (Barahona)("I asked him again do you live here?  He stated yes, sir.  I asked him about [] how long he's been living there, and Mr. Orphan stated that he's been living there for about three months.").  See id. at 99:5-12 (Rowley, Orphan)(Q: "Were you ever asked if you were a resident[] of that property?"  A: "They asked me

if I lived there, I told him I had been staying there off and on for the previous three or four

months . . . .");[7] Feb. 6 Tr. at 63:1-3 (Rowley, Kepf)(stating that the other officers in the front

yard "were engaged with the male that was on the fence," and noting that "he was in handcuffs,"

---

[7] Orphan continued his testimony, stating that he told them "but it wasn't my permanent place of residence. . . . It was just a place we stayed like I said off and on." Feb. 5 Tr. at 99:9-12 (Orphan, De la Garza). Barahona, Kepf, and Martin all testified, however, that when Barahona asked Orphan where he lived he "pointed" toward the trailer. Feb. 5 Tr. at 59:19-20. See Feb. 6 Tr. at 63 (Kepf)("[T]he[] [officers] were asking him, you know, did he live there . . . . and he pointed with his head to the back of [the] house and said, yes, I live [] in the back room with my girlfriend."). Additionally, Spruell testified that he asked "where Mr. Orphan lived," and Orphan "pointed to the window." Feb. 5 Tr. at 108:8; 108:14 (Pflugrath, Spruell). None of the officers' testimony included that Orphan told officers that it is not his "permanent place of residence." Moreover, all three officers testified that they asked him, specifically, where he "lived." Faced with such a question, as opposed to asking whether he owned the house, or, perhaps, even whether it was where he permanently lived, it is not, in the Court's opinion, likely that Orphan stated it was not his "permanent . . . residence," even if he may have intended to do so. First, in such a situation, it is unrealistic that Orphan would use the word "residence" rather than home, house, trailer, mobile home, or something of the same nature. Second, notably, as of April 3, 2012, Barahona had executed at least one hundred arrest warrants, see Feb. 5 Tr. at 60:8 (Barahona), Martin testified that he had executed "hundreds," Feb. 6 Tr. at 3:8 (Martin), and Kepf testified that she had executed "probably 50 to 60" arrest warrants, Feb. 6 Tr. at 57:11 (Kepf). Both Barahona and Kepf testified that, in execution of arrest warrants, they had asked and not received consent to enter a home, and Barahona testified that, in such situations, he "stop[s] the search there and then. I honor the subject's right and seek out a search warrant if needed." Feb. 5 Tr. at 60:19-20 (Barahona). With that amount of experience, the Court concludes that, if Orphan had stated that Chavez' home was not his "permanent place of residence," Feb. 5 Tr. at 99:9 (Orphan), the officers would remember words with such legal import, would not have asked for his permission to search the home, and would have understood that they had obtained the proper consent to search the home. For example, Spruell testified that he did not recall Orphan using any modifiers, such as "occasionally, sometimes, most of the time[]." Feb. 5 Tr. at 109:7-9. He stated that he would certainly remember if Orphan had used any such modifier, "because, basically, somebody who says occasionally I stay there" cannot give the proper permission for a search warrant. Feb. 5 Tr. at 109:10-22 (Rowley, Spruell). The Court therefore finds that Orphan did not respond to Barahona's question by stating that the home was not his permanent place of residence. The Court also believes, however, that, just as Orphan would likely not have had the wherewithal, while handcuffed and against the fence, to tell the officers who had just entered the property to execute arrest warrants that the home was not his permanent residence, he likely had trouble recalling specifically the words he used during the conversation with Barahona. Thus, it appears that Orphan's recollection of the events is less worthy of credence than the officers'.

when he stated that "he live[s] in the back room with my girlfriend").

33.     Barahona asked if there were other individuals inside the home.  <u>See</u> Feb. 5 Tr. at 59:25 (Barahona)("I asked him if there was anybody else inside the residence[.]").

34.     Orphan said that two individuals were inside: "Erica" and "Robert."  Feb. 5 Tr. at 59:25-60:1 (Barahona)("I asked him if there was anybody else inside the residence[.]  [H]e stated yes Erica and Robert.").  <u>See</u> Feb. 6 Tr. at 63:10-11 (Rowley, Kepf)("[Orphan] indicated that there may be two people, a male and a female in the residence still.").

35.     Barahona then asked Orphan "who Erica and Robert were," and Orphan told him about Erica and Robert's relationship.  Feb. 5 Tr. at 103:14-17 (Orphan)("[T]hey asked me who else was inside, and I told them Erica and Robert, and they asked me who Erica and Robert were and I told them the relationship of Erica and Robert.").

36.     Barahona then asked for and received permission to go in and look for them.  Nothing in Orphan's behavior or demeanor indicated that he was not in control of the premises.  <u>See</u> Feb. 5 Tr. at 60:1-3 (Barahona)("I asked [] Mr. Orphan may we go inside and find these people in there?  Mr. Orphan [] stated yes and we were able to go inside."); Feb. 6 Tr. at 63:11-19 (Rowley, Kepf)("Officers asked him if we could go inside the residence and he said yes."  Q: "And did you hear him say yes?"  A: "Yes. . . . [I was] [m]aybe six to ten feet [away].").[8]

---

[8]  Chavez contends that, because Rock's sworn statement that officers knocked on Chavez' door and that he came to the door to answer is at odds with the assertion that Orphan consented to the search, the officers did not request Orphan's consent to enter the house, and Orphan did not give consent.  Both Kepf and Barahona testified, however, that Barahona asked Orphan for permission to enter the house and that Orphan provided permission to do so.  <u>See</u> Feb. 5 Tr. at 60:1-3 (Barahona); Tr. at 63:11-19 (Rowley, Kepf).  Moreover, Rock testified at the hearing that "I first came in contact when I went into the front door Mr. Chavez was sitting on the couch in the living room."  Feb. 5 Tr. at 114:7-9 (Pflugrath, Rock).  Rock's hearing testimony was thus not inconsistent with Kepf and Barahona's accounts.  Moreover, when asked

37.    There was nothing in Orphan's behavior to indicate that he did not reside at 1301 Pear or was not being truthful with Barahona.  See Feb. 6 Tr. at 64:22-65:1 (Rowley, Kepf)(Q: "What was Mr. Orphan's tone of voice?"  A: "[H]he was calm.  They weren't yelling.  It was just a normal tone of response."  Q: "Did you observe any signs of agitation?"  A: "No.").[9]

whether Chavez "[met] with Homeland Security investigation [] agents at the door and greeted them when they came in," Rock responded: "I don't know. I wasn't present."  Feb. 5 Tr. at 115:3-6 (Pflugrath, Rock).  Rock's hearing testimony thus does not conflict with Barahona's and Kepf's testimony that they received consent to enter the property from Orphan, and entered through the open front door.  When asked to what Rock was referring in his sworn statement in the Statement of Probable Cause, wherein he stated that the officers knocked and asked for permission to search, Rock stated that he was referring to Chavez' "bedroom[,] where he was . . . staying at or his residence inside the house . . . . [I]t was specifically his bedroom."  Feb. 5 Tr. at 115:12-17 (Pflugrath, Rock).  So construed, Rock's sworn testimony is thus consistent with Barahona's and Kepf's accounts of having received Orphan's consent to enter the residence, and entering through an open front door.

Although Orphan testified that the officers "never asked for permission to enter the property," and that he "didn't" give them permission to do so, Feb. 5 Tr. at 99:21-24 (De la Garza, Orphan), the Court concludes that Orphan's recollection of these events is less credible than the officers': Barahona and Kepf both testified to hearing Orphan give permission to the officers to go inside the house.  As the Court found in footnote 7, supra, the amount of experience both Barahona and Kepf have in executing arrest warrants counsels in favor of accepting as fact their recollection of the events.  Although, on the one hand, the number of arrest warrants they execute might cause them to forget some specific details about executing particular search warrants, both officers, on the other hand, through experience and training, likely know that they need legally effective consent to search a premises for which they do not have a search warrant.  There is no contention here that the officers ever had or believed that they had a search warrant for the home on 1301 Pear Grove.  Thus, while the officers would likely forget or misremember certain details about the execution of arrest warrants, the Court does not believe Barahona and Kepf, given their experience, would misremember gaining the consent that they needed, and used, to search Chavez' home without consent.  The Court therefore finds that Barahona asked for, and received, Orphan's permission to enter the home.

[9]    Additionally, Martin testified that Orphan appeared relaxed during Barahona's questioning, further indicating that he was being truthful and not evincing any signs that he did not reside at 1301 Pear Grove.  See Feb. 6 Tr. at 43:10-20 (De la Garza)(Q: "[B]ecause you mentioned that you could hear the conversation, you could tell the demeanor of Mr. Orphan, it appeared to you that he had prior contact with law enforcement, didn't appear nervous, was speaking calmly and based on your experience, your training that your opinion was that [] he was calm, and that would include that he was telling the truth; [correct]?"  A: "[Y]es, sir."  Q: "And you could hear all that conversation, you were there, you were within earshot is that correct?"  A:

38.     Orphan appeared to have had "prior contact with law enforcement."  Feb. 6 Tr. at 10:10-11 (Martin)("[Orphan] wasn't intimidated by our presence[].  I would assume he had prior contact with law enforcement.").

39.     Orphan was not on his knees at the time he gave his consent, but he was sitting propped up against the fence.  See Feb. 5 Tr. at 58:5-7 (Barahona)("I lifted him up and [] walked him towards this inner [fence] area so I can sit him down so he can sit against the [fence] . . . .");

40.     Orphan did not have his hands up at the time he gave his consent, because he was in handcuffs.  See Feb. 6 Tr. at 63:1-3 (Rowley, Kepf)(stating that the other officers in the front yard "were engaged with the male that was on the fence," and noting that "he was in handcuffs," when he stated that "he live[s] in the back room with my girlfriend").[10]

41.     Barahona made this request without any promises, threats, or intimidations.  See Feb. 5 Tr. at 59:1-4 (Barahona)(stating that when he began to question Orphan after performing the pat-down, during which Orphan gave officers his consent to go inside, Barahona's "pitch went down because the threat level I felt was more secure now especially [] that he was retsr[ained] in [handcuffs] . . . ."); id. at 62:10-13 (Barahona)("Once [Orphan] was restrained [] and I was passive with him in reference to my verbal interaction and he also became passive and

"Right.").

[10] Chavez asserts that Orphan was on his knees and that Orphan had his hands up at the time he gave his consent.  Both Kepf and Barahona testified that Orphan was on the ground propped up against the fence.  Barahona testified that he "lifted him up and [] walked him to towards this inner [fence] so I can sit him down so he can sit against the [fence] . . . ."  Feb. 5 Tr. at 58:5-7 (Barahona)(emphasis added).  HSD Agent Chris Martin also testified that Barahona "allowed Mr. Orphan to sit there and they continued their conversation."  Feb. 6 Tr. at 8:20-21 (Martin).  The Court finds that Orphan was sitting against the fence.  He was thus not on his knees at the time he gave his consent.  Additionally, as both officers testified that Orphan was handcuffed at the time that he gave his consent, the Court finds that his hands were not in the air at the time that he gave his consent to enter the residence.

we were able to interact by communicating back and forth for [a] few minutes."); Feb. 6 Tr. at 64:15-21 (Rowley, Kepf)(Q: "[W]hat generally was Agent Barahona's tone of voice during this conversation [with Orphan]?" A: "Just very direct, but he sort of has a formal way of speaking, so direct and to the point."  Q: "Was it -- did he have an elevated tone of voice or volume?"  A: "No.").

42.     Orphan was "compliant" in his answers during Barahona's questioning, his testimony at the hearing indicates that he did not feel emotional or sad, and he did not appear intimidated by the officers' presence.  See Feb. 5 Tr. at 97:23-98:1 (de la Garza, Orphan)(when Orphan was asked on direct examination whether he felt "threatened," "happy," or "sad," during Barahona's questioning, he responded: "Definitely not happy.  I wasn't sad either. I was just compliant"); Feb. 6 Tr. at 10:10 (Martin)("He wasn't intimidated by our presence[].")

43.     Rock was not present for the conversation with Orphan.  See Feb. 5 Tr. at 114:6-115:6 (Pflugrath, Rock)(stating that Rock was not "present" when the officers entered the residence or gained consent to do so.).

44.     There are often more individuals inside a building than the number of individuals in the home of which the officers are informed.  Barahona believed it possible there were more individuals inside 1301 Pear Grove than Robert and Erica, and including the individuals named on the arrest warrant.  See Feb. 5 Tr. at  60:6-8 (Barahona)(stating that he has executed "[a]t least a hundred arrest warrants"); id. at 61:8-62:7 (Rowley, Barahona)(stating that Barahona "did not at the time" that Orphan told him only Bosco and Chavez were in the house know it to be true, and "believe[d] that [the two named individuals on the arrest warrant] could have been in the

-17-

home despite [Orphan's] answer").[11]

45.     Rock had given chase to Crain, and did not return until after Orphan gave his consent and the officers had made entry into the home.  See Feb. 5 Tr. at 119:25-120-2 (Rock)("I was in the backyard actually arresting another subject, so I wasn't actually present at the front door when they made [entry] . . . into the door."); id. at 125:11-12 (Pflugrath, Rock)("I believe that person was a Mr. [Crain]?"  A: "Yes, Michael Crain.").

46.     HSD Agent Chris Martin proceeded to the front door of the house, asked for cover, and, when a second officer joined him, asked Barahona if they had consent to enter the house.[12]

47.     The agents lined up to make entry into the house with Martin in front, Kepf second, and HSD Agent Jacob Dye as the third officer in the rear.  See Feb. 6 Tr. at 117:2-5 (Dye)("When I believed we had [consent] we basically organized a three person entry team with

---

[11] Barahona added that securing the premises necessarily requires ensuring that officers do not face a threat from inside the house:

> For us to secure the whole area, including the inside of the premises is why I asked also for consent to go inside the house so that way all of us on an officer safety factor are securing the whole premises . . . so that way we know that there's no threats either against ourselves or against the subjects . . . .

Feb. 5 Tr. at 83:11-22 (Barahona).

[12] Martin's testimony proceeded as follows:

Q: So what happened after [Barahona's] conversation [with Orphan]?

A: I was stilling for cover at that point. Then I had a second agent come behind me, you know this is taking . . . a couple minutes [and] a second agent come up and then I asked Agent Barahona if we had consent to go[] [in] the house . . . .  He said yes we just got consent.

See Feb. 6 Tr. at 11:15-23 (Rowley, Martin).

Christ Martin being number one, A[bby Kepf] being number two and myself being number 3.  I wish we could have had more people but everybody else was engaged . . . .").

48.     Because the front door was open, the officers made their presence known by shouting in through the door and by ordering those inside to come out.  See Feb. 6 Tr. at 13 13:6-7 (Martin)("[T]he door was slightly [ajar] the door was already [open].");  id. at 42:17-20 (de la Garza, Martin)(Q: "There's actually two doors is there not?"  A: "Right it was the glass screen [door] that was slightly ajar [and] the other door was totally wide open.");  id. at 68:4-7 (Rowley, Kepf)("Prior to us entering the home we announced several times, 'this is the police, we're here.  Please come out with your hands up.'  We made several of those commands . . . ."); Feb. 5 Tr. at 84:23-25 (de la Garza, Barahona)("I do recall agents an[d] officers saying police as they were entering the premises, but as I mentioned before my attention was more towards Mr. Orphan since he was my subject."); Feb. 6 Tr. at 12:9-13 (Martin)("[W]e decided to go ahead and announce ourselves as [making] entry into the home and then we proceeded to enter the home."); id. at 12:24-13:3 (Martin)("We go ahead and [announce] that 'we're police we'll be [entering] the residence[,] if there's anybody in the residence to let us know [and] come up with their hands . . . .").

49.     Hearing no response, but some shuffling in one of the back rooms, the officers then entered.  See Feb. 6 Tr. at 13:10-15 (Rowley, Martin)(Q: "[Did] you receive any response to this?" A: "No, sir not [] at all."  Q: "Approximately how long [did] you wait for a response?" A: "We announced three times.  When I didn't hear anything . . . [we] went ahead and made entry."); id. at 65:14-23 (Rowley, Kepf)(stating that while walking between the house, before making entry, she "could hear loud [trumping] or pounding . . . or ban[g]ing coming from the

side of the house, interior of the house.").

50.     Inside the house, Kepf continued to announce their presence.  See Feb. 5 Tr. at 85:6-9 (de la Garza, Barahona)("All I could hear [from inside the house] was officers inside [] saying 'police.'"); id. at 69:6-16 (Kepf, Rowley)(testifying that, while entering the house and making entry in the back room, the officers were "making loud commands, identifying ourselves as police officers, asking them to come out in the noncompliant nature . . . .").

51.     During the cursory examination of the home, one of the individuals, Erica Bosco, was found in a closet, hiding from the officers.  See Feb. 6 Tr. at 70:2-16 (Rowley, Kepf)("[A]nother agent . . . said that they could hear movement in . . . the last bedroom, and he believed that there was somebody hiding in that room. . . . [T]here was a female hiding.").

52.     Bosco was arrested on an outstanding warrant.  See Tr. at 70:18-24 (Rowley, Kepf)(testifying that she put "handcuffs on [Bosco], [and] patted her down right away . . . [because] she said 'I have a warrant.'").

53.     In this same sweep, the officers observed, through an open door in the hallway, a man lying on a bed.  See Feb. 6 Tr. at 14:8-22 (Rowley, Martin)("I started [walking] into the hallway[.]  I saw . . . that there was a[] room directly in front of me.  So [] we made entry into the hallway I could see [] the far bed[room] . . . . and I could see feet from coming out from a bed . . . ."); id. at 67:7-13 (Kepf)(testifying that as the officers entered the home "we did a quick . . . glance and we didn't have an issue . . . . [T]he doors were open to the rooms.  And I can remember hearing a TV on in a back bedroom and sort of looking over and seeing feet on a bed . . . .").

54.     Because the man had not responded to the officers' earlier calls, the officers

entered the room.  See Feb. 6 Tr. at 21:5-22:1 (Rowley, Martin)(testifying that after yelling for

Chavez to show the officers his hands "probably three or four times," Martin "decided to go

ahead and make entry . . . because . . . he doesn't want to show me his hands and he's

unresponsive").

55.     Martin entered Chavez' private bedroom, where Chavez was sleeping, and found

Chavez lying with his hands under a pillow or blanket near his head.[13]

56.     The officers also observed several knives hanging on the walls, a broad sword in

the bedroom, and what appeared to be drugs and drug paraphernalia on the bedside table, in plain

view.  See Feb. 6 Tr. at 16:24-17:7 (Rowley, Martin)("So when we walked in initially what I saw

was he had a drawer [open] . . . . [T]here was quite a lot of paraphernalia there as far as [] knives

. . . he had throwing darts or something like that on there [] and then he also had had a . . . broad

sword."); id. at 17:13-18 (Rowley, Martin)("I did a quick scan of the room and it looked like he

had several knives . . . he had them displayed on the wall and also on a dresser."); id. at 66:25-

67:5 (Rowley, Kepf)(Q: "And what did you first observe when you entered the home?"  A: "[A]t

a first glance I believe there was marijuana . . . on a table in an ashtray . . . [a] user[-]amount of

marijuana, maybe a pipe . . . ."); id. at 68:24-69:5 (Kepf)("The third bedroom . . . is where we

---

[13] Martin's testimony proceeded as follows:

Q: So what if anything did you do when you saw those feet?

A: Thought that there was a body there. . . . [S]o after clearing the first two rooms
I walked to the door space over the door [and] looked [into] the room and
identified Mr. Chavez . . . .  He was laying on the bed. . . . .  [H]is feet were
towards the door and he had his hands behind a pillow behind his head.

Feb. 6 Tr. at 16:12-24 (Rowley, Martin).

encountered a male that was on his bed, and there were knives and like swords and knives all

behind the bed and within his reaching area . . . ."); Plaintiff's Ex. 2 (picture of broad sword and

knife on Chavez' bed taken during the search of Chavez' home).[14]

57.     After Martin ordered "police show me your hands" through the doorway, and

received no response from Chavez, Martin entered the room and awoke Chavez.  See Feb. 6 Tr.

at 69:18-21 (Kepf)("Special Agent Martin went in first . . . eventually Agent Martin was able to

[rouse] him . . . ."); id. at 20:20-21:19 (Rowley, Martin)("As I was entering . . . I stopped at the

door, told him that police let me see your hands . . . . I probably announced it three or four times.

. . . After a couple of seconds being there yelling through the door that's when I decided to go

ahead and make entry . . . .").

58.     Martin awoke Chavez abruptly out of concern that Chavez might have had a

weapon in his hands underneath the pillow, by using a maneuver called the "sternum rub" to gain

compliance.  See Feb. 6 Tr. at 21:18-22:15 (Martin, Rowley)("After a couple of seconds being

there yelling through the door that's when I decided to go ahead and make entry and . . . .

because . . . he doesn't show me his hands he's unresponsive and at that point I give him . . . a

sternum rub [with the muzzle of my gun] to gain compliance . . . ."); id. at 47:17-24 (de la Garza,

Martin)(noting that the sternum rub is "not a poke."  Q: "[You rub the person's chest] with the

intent of inflicting pain so they'll comply?  A: "Correct sir.").

---

[14] Additionally, Dye testified:

I had kind of seen that on the bedst[an]d there was -- there was kind of a white
powdery substance in a bag . . . as well as other drug paraphernalia.  You know
there was a lot of needles . . . and I believe there was some bent spoons and stuff .
. . directly next to the bed.

Feb. 6 Tr. at 122:25-123:5 (Dye).

59.     When Chavez awoke, Martin asked if he had any weapons on him.  When he said

no, Martin handed him off to Dye, who then escorted him to the living room.  See Feb. 6 Tr. at

22:14-19 (Martin)("After he woke up he . . . he was coming out of whatever daze . . . he was in. .

. .  I passed him off to Agent Dye and Agent Dye was the one that [escorted] him out of the

room.").

60.     In the living room, Dye and Spruell spoke with Chavez.  See Feb. 6 Tr. at 71:10-

15 (Rowley, Kepf)("After [arresting Bosco] I was back in the living room with Mr. Chavez, and .

. . . Spruell[] was in the room and Special Agent [Dye] was in the room too . . . .  [Chavez] was

sitting on the couch."); id. at 123:9-12 (Dye)("So at that point we asked [] Chavez what his name

was, [he] told us it was Robert Chavez . . . . and then Travis Spruell launches right into reading

him his Miranda[15] warnings.").

61.     Another officer may have come into the conversation intermittently.  See Feb. 6

Tr. at 94:11-17 (de la Garza, Kepf)(testifying that she could not remember whether four officers

_____

[15] Miranda v. Arizona, 384 U.S. 436 (1966), "requires that procedural safeguards be
administered to a criminal suspect prior to 'custodial interrogation.'"  United States v. Perdue, 8
F.3d 1455, 1463 (10th Cir. 1993)(quoting Miranda v. Arizona, 384 U.S. at 444).  The Supreme
Court provided the substance of the warning that must be given to a defendant to meet these
procedural safeguard requirements:

> Prior to any questioning, the person must be warned that he has a right to remain
> silent, that any statement he does make may be used as evidence against him, and
> that he has a right to the presence of an attorney, either retained or appointed.  The
> defendant may waive effectuation of these rights, provided the waiver is made
> voluntarily, knowingly and intelligently.  If, however, he indicates in any manner
> and at any stage of the process that he wishes to consult with an attorney before
> speaking there can be no questioning.  Likewise, if the individual is alone and
> indicates in any manner that he does not wish to be interrogated, the police may
> not question him.

Miranda v. Arizona, 384 U.S. at 444-45.

were questioning Chavez the entire time: "Maybe it was only three.  I know for sure it was myself, Travis Spruell, and Jake Dye.  I remember Agent Barahona was sort of in and out . . . and I don't know if Mr. Martin was there."); id. at 127:17-23 (Dye)("It was myself and Travis Spruell at the beginning of the conversation.  I think somewhere while we were talking to [Chavez] I think Agent Kepf . . . [was] kind of passing through . . . behind us while we were talking, and then I think that . . . Dave Rock also came in . . . .").

62.     All of the officers had their weapons holstered during this conversation, and they spoke with Chavez in a normal, business-like, direct tone.  See Feb. 6 Tr. at 97:23-98:5 (Rowley, Kepf)("[T]here were several officers in the room with Mr. [Chavez] . . . . [All of the officers' weapons] were [holstered]."  Q: "Did any officer have their weapon out []?"  A: "No, sir."); id. at 127:24-25 (Dye, Rowley)(Q: "And where were the officers' guns at this time?"  A: "All of them were holstered"); id. at 72:23-73:1 (Rowley, Kepf)(Q: "And what was the tone of the agents when they were speaking with Mr. Chavez?"  A: "Just sort of how we talk most of the time, just normal tone, direct, but not aggressive, not loud, not yelling."); id. at 126:9-10 (Rowley, Dye)(Q: "What was your tone during this conversation?"  A: "It was regular conversational tone.").

63.     Spruell informed Chavez of his rights under Miranda v. Arizona, 384 U.S. 436 (1966).  See Feb. 6 Tr. at 123:9-12 (Dye)("So at th[e] point [when Chavez entered the living room,] we asked [] Chavez what his name was, [he] told us it was Robert Chavez . . . . and then Travis Spruell launches right into reading him his Miranda warnings.").

64.     Chavez waived his rights under Arizona v. Miranda and consented to speak with the officers.  See Feb. 6 Tr. at 71:25 (Kepf)(:Travis Spruell was the one that Mirandized him, and

he said he was willing to talk and cooperate with us."); id. at 123:11-125:21 (Dye, Rowley)("Travis Spruell launches right into reading him his Miranda warnings. . . .  He acknowledged -- was asked, 'do you understand?' and he said, 'I understand.'").

65.     The officers began to question Chavez and extracted incriminating statements, which led to the discovery of the firearm at issue in this action: Dye asked if there were firearms in the home and Chavez said that he had a handgun under his bed, which he was holding for someone else.  See Feb. 6 Tr. at 72:2-6 (Kepf)("I think that it was Special Agent [Dye] that had asked him if there were any firearms in the house, and that point he said, yes, he had one in his bedroom that he was holding for somebody that -- a friend of his that had been recently incarcerated.").[16]

66.     The officers asked for permission to go into the room and retrieve the handgun. They received Chavez' permission to go into the room and retrieve the handgun.  See Feb. 6 Tr. at 73:8-10 (Kepf)("[H]e said the firearm was in his room. . . .  We asked if we could go get it. He said yes."); id. at  128:11-14 (Rowley, Dye)(Q: "What did you do with the information that he had a gun?"  A: "I asked him, 'can I go get it?'"  Q: "What did he say?"  A: "He said yes."); Statement of Probable Cause, Defendant's Ex. A3 ("Chavez gave us consent to search his room. Chavez said that he was a convicted felon and had a firearm next to his bed.").

---

[16] In addition, Dye testified as follows:

I had observed what appeared to be narcotics . . . I asked him . . . "what's in the white baggy . . . . ?" And his response was that it was bunk cocaine. . . . I asked him . . . whether there were any weapons in the house . . . .  He told me there was a gun in his bedroom . . . .  then I asked him if he -- if he was a convicted felon . . . . .  He told me that he was a convicted felon.

Feb. 6 Tr. at 126:2-127:3 (Rowley, Dye).

67.     When Kepf could not find the handgun, Agent Dye asked Chavez to show them where the handgun was.  See Feb. 6 Tr. at 73:10-25 (Kepf, Rowley)("[W]e went to his room to try to find [the handgun] . . . I heard him say that it was going to be under the bed, so I'm looking under both sides of the bed and I'm not finding it."  Q: "So what did you do when you couldn't find it?"  A: "We got back up, myself and . . . Agent Dye, . . . and went back to where Mr. Chavez was sitting . . . and then he gave us more specific instructions . . . ."); id. at 95:25-96:5 (de la Garza, Kepf)("I just remember Agent Dye asking for clarification [where the gun was], because at that point it was a safety issue.").

68.     Chavez told the agents that it was located in a drawer.  See Feb. 6 Tr. at 74:1 (Kepf)(testifying that Chavez told Kepf the gun "was in a coffee table or a nightstand under a drawer."); id. at 128:15-129:4 (Rowley, Dye)(Dye testifying that when he could not find the gun, he walked back to the living room and "said can you come back to the room and show me where it is?"; when they "walked into the room, [] I said, 'Where's it at?' and he pointed to the . . . nightstand . . . then I said 'where in the nightstand?' And he instructed me to pull out the drawer and look underneath."); Statement of Probable Cause, Defendant's Ex. A3 ("I assisted in the search of his bedroom.  I did not find the gun beside the bed as described.  I again asked Chavez where the gun was at.  Chavez said the gun was in the original cardboard box (yellow and brown) under the drawer of the night stand.").

69.     The officers found the firearm stashed underneath a drawer next to the bed.  See Feb. 6 Tr. at 73:24-74:1 (Kepf)("We had to pull out the drawer and then it was -- it was under that.  And that was next to the bed."); id. at 96:25-96:6 (de la Garza, Kepf)(Q: "[The gun] was underneath a drawer . . . .?" A: "Yes.  When you pulled out the drawer to the nightstand you had

to pull the drawer all the way out and then there was a void space between the bottom of the drawer and the floor, and so it was placed there. . . . I think it was in a box or a bag."); id. at 129:6-7 (Dye)("[U]nderneath the drawer, you know, was a box, you know, that contained [] a .22 caliber handgun and ammunition."); Statement of Probable Cause; Defendant's Ex. A3 ("We looked under the nightstand and found the box with the gun inside the box.  I saw the gun was a .22 caliber revolver with some .22 shells . . .  next to the gun.").

70.     Dye asked Chavez if had any felony convictions, and Chavez said he did.  See Feb. 6 Tr. 126:24-127:3 (Dye, Rowley)("After he [told] me . . . there was the gun in the house, then I asked him if he -- if he was a convicted felon. . . .  He told me he was a convicted felon."); id. at 96:12-21 (de la Garza, Kepf)(Q: "[H]ad Agent Dye also asked if Mr. Chavez was a convicted felon?"  A: "I don't recall when that . . . questioning took place."  Q: "Did you ever hear a line of questioning like that between [A]gent [D]ye and [] Mr. Chavez?"  A: "I recall . . . he said yes, he had a prior felony conviction. . . . .  That was after being Mirandized"); Statement of Probable Cause, Defendant's Ex. A3 ("Chavez said that he was a convicted felon . . . .").

71.     Chavez was then placed under arrest, and the firearm and drug paraphernalia were secured until a warrant could be obtained.  See Feb. 6 Tr. at 130:18-20 (Rowley, Dye)("And was the gun [and drug paraphernalia] that w[ere] in Mr. Chavez's possession taken into evidence?"  A: "Yes . . . .").

72.     In his Statement of Probable Cause for the Criminal Complaint for Robert Chavez that Rock filed in state court on April 4, 2012, Rock states:

> I exited my vehicle one house north of 1301 Pear Grove and there were two males in the driveway.  One male saw me and ran . . . . I cut the male subject off as he was about to jump over the [] fence. . . . I identified the male with his NM identification card as Michael Crain [].

Statement of Probable Cause (wherein Rock provides his affidavit), Criminal Complaint for Robert Chavez, Defendant's Ex. A3.

73.     Rock's description in his Statement of Probable Cause is that "[t]he other Agents knocked on the front door and contacted several other people in the house.  One subject was Robert Chavez (DOB [  ]).  Chavez gave us consent to search his room."  Statement of Probable Cause, Defendant's Ex. A3.

74.     Rock does not state in the summary in his affidavit that Orphan gave the officers consent to search the home or that the front door was open when they did so.  See Statement of Probable Cause, Defendant's Ex. A3.

75.     A state court issued a search warrant in State v. Robert Chavez, SW 2012-47-3, for the search of 1301 Pear Grove and of two vehicles, for drugs and firearms.  See Feb. 6 Tr. at 130:15-17 (Rowley, Dye)(Q: "And did you obtain a state search warrant?"  A: "Yes . . . .  A state search warrant was sought and obtained.").

76.     The joint task force did not find Santiesteban, Anthony Webb, or Kevin McKenzie -- the individuals for which the officers were searching in Operation Forsaken -- at 1301 Pear Grove.  See Feb. 5 Tr. at 26:3-5 (de la Garza, Spruell)(Q: "And was any of you [] targets -- were any of your [] targets found at Mr. Chavez's residence?"  A: "No, sir, they weren't."); Feb. 6 Tr. at 136:10-137:4 (de la Garza, Dye)(Mr. de la Garza asking Officer Dye whether he was aware that Santiesteban was arrested simultaneously with the operation at Chavez' residence at another residence down the street, and Dye responding that he "was aware hours later . . . I had conversations with the team leaders and then they indicated that they had pick [up Santiesteban]."); San Juan County Detention Center Detention Report for Eddie

-28-

Santiesteban, printed February 1, 2013, admitting as Defendant's Ex. B at the hearing (stating

that Santiesteban was arrested at 1407 Pear Grove Lane); San Juan County Detention Center

Detention Report for Anthony Jacob Webb, printed February 1, 2013, admitted as Defendant's

Ex. C at the hearing (demonstrating that Webb was detained on March 24, 2012, and released on

May 18, 2012).

## PROCEDURAL BACKGROUND

Chavez moves the Court, pursuant to rule 12 of the Federal Rules of Criminal Procedure,

to enter an order suppressing the fruits of the allegedly illegal search of his residence, and ruling

that any evidence acquired as a result of such search may not be used at trial or otherwise.  See

Suppression Motion at 1.  Chavez argues that the United States cannot meet its burden to show

consent.  See Suppression Motion at 2.  Chavez asserts that, because Rock's sworn statement in

Chavez' criminal complaint is inconsistent with the federal agents' contention that Orphan

consented to the officers' entry into the residence, the government cannot show consent was ever

freely given.  See Suppression Motion at 3 (citing Florida v. Royer, 460 U.S. 491, 497 (1983)).

Chavez contends that, even if Orphan consented, his consent was not voluntary.  See

Suppression Motion at 3.  Chavez asserts that, because Orphan was "on his knees with his hands

up at the time he allegedly gave his consent," he felt "threatened and coerced," and was thus only

submitting to authority.  Suppression Motion at 4.

Chavez argues that, if Orphan consented to the officers' searching the residence, he did

not have the authority to consent, because he had neither actual authority nor apparent authority

to give such consent.  See Suppression Motion at 4.  Chavez asserts that, to prove actual

authority, the United States Court of Appeals for the Tenth Circuit requires "the government to

show that 'the third party entered the premises or room at will, without the consent of the subject

of the search.'"   Suppression Motion at 5 (quoting United States v. Cos, 498 F.3d 1115, 1125-26

(10th Cir. 2007)).   Chavez contends that "Orphan clearly lacked the authority to grant consent,"

given that

> Justin Orphan was only an occasional visitor to the premises.   He stored no
> clothing or other possessions there.   Most important, he did not have free access
> to the premises, had no key and paid no rent.   He could enter only when one of the
> actual residents was present and allowed him to enter.   He was not allowed in the
> house alone.

Suppression Motion at 5.   Chavez argues that Orphan lacked apparent authority also.   See

Suppression Motion at 5.   Chavez asserts that, "[w]here it is at all ambiguous whether the party

allegedly giving consent has the authority to do so, 'agents are required to investigate further

before relying on the consent or the government will have failed to meet its burden to

demonstrate apparent authority.'"   Suppression Motion at 6 (quoting United States v. Cos, 498

F.3d at 1129; 4 Wayne R. LaFave, Search and Seizure § 8.3(g), at 180 (4th ed.

2004)("[S]ometimes the facts known by the police cry out for further inquiry, and when this is

the case it is not reasonable for the police to proceed on the theory that 'ignorance is bliss.'")).

Chavez contends that, because the officers discovered Orphan in the driveway, rather than the

house, and because "nothing in his behavior or demeanor could have indicated that he was in

control of the premises," the Court should find that the United States cannot meet its burden to

prove apparent authority.   Suppression Motion at 6-7.

On January 4, 2013, in the United States' Response to the Defendants' Motion to

Suppress, the United States asserts that Orphan freely and voluntarily gave valid consent,

because he had apparent authority to do so.   See Doc. 31 at 3 ("Response").   The United States

argues that Rock's statement in the Statement of Probable Cause is consistent with Orphan giving the officers consent to search the home, because Rock's statement provides only a short statement regarding the consent to search the home. See Response at 4. The United States explains that Rock was not present when Orphan gave consent and, although Rock does not state that Orphan gave consent, Rock does not say that someone else gave consent or explain, in detail, how the officers obtained consent. See Response at 4. The United States contends that Rock's statement is thus not inconsistent with Orphan having provided the officers consent to search the house. See id.

The United States contends that, whether consent is volunteered is based on the circumstances, and the circumstances here show that Orphan's consent was voluntary. See Response at 4-5. The United States asserts that "Orphan's consent was unequivocally, specifically, freely and intelligently given," as the officers asked if they could enter the home to look for individuals, clearly stating the purpose of the search, and Orphan responded that they could. See Response at 5. The United States also asserts that the officers did not coerce Orphan's consent, because the officers were not threatening in their tone or words, they did not take any of his personal effects, and, at the time that Orphan gave permission, they were not pointing a weapon at Orphan. See Response at 5. The United States concedes that Orphan was being detained when he gave his consent, but asserts that detention does not equate to coercion. See Response at 6.

The United States argues that Orphan's consent was effective, because Orphan had apparent authority to give consent. See Response at 6. It asserts that "[t]he touchstone" of whether a third party has apparent authority for purposes of consenting to search a home is "the

reasonableness of the officers' conduct: if 'the facts available to the officers at the time they commenced the search would lead a reasonable officer to believe the third party had authority to consent to the search,' that third party may have apparent authority."  Response at 6 (quoting United States v. Andrus, 483 F.3d 711, 716-17 (10th Cir. 2007)).  It argues that it was reasonable for the officers to assume that Orphan had authority to consent to the search, because he ran towards the open front door when they arrived, stated that he lived there when the officers asked, and stated that he had been living there for three or four months.  See Response at 7.  The United States asserts that the officers acted within the scope of Orphan's consent.  See Response at 7. The United States argues that, because the residence at 1301 Pear Grove was a small home and the officers observed Chavez' feet from the hallway, even if Orphan had apparent authority only as to the common areas of the home, as Chavez failed to respond to their orders to come out when viewed from the common areas, their entering his room was within the scope of consent as entry into his room was necessary for officer safety.  See Response at 7.

The United States also argues that, even without Orphan's consent, the officers could have performed a protective sweep of the home subsequent to Crain's arrest.  See Response at 8. The United States asserts that, because the officers arrested Crain on the property, having two outstanding warrants for him, and because Orphan told officers that there were two individuals in the home, neither of whom came out when the officers announced their presence, the officers had a reasonable belief that the individuals in the home may be armed and may present a serious threat to the officers' safety.  See Response at 8.  The United States contends that the officers' entry into Chavez' home was justified as a result, and they constitutionally discovered all evidence subsequently found in the home.  See Response at 9.

The United States contends that the Court should not exclude the firearm as fruit of the poisonous tree, even if the officers' entry into the home was unjustified, because the Chavez' consent to search his room removed any taint that any wrongful entry into the home may have had.  See Response at 9.  The United States asserts: "Defendant knowingly waived his Fourth Amendment rights when he gave consent for the officers to search his room for the firearm.  This consent is sufficiently distinguishable from the entry to the home to purge the evidence it produced from any taint resulting from an unlawful entry."  Response at 9 (citing Brown v. Illinois, 422 U.S. 590 (1975)).  It states: "[V]oluntary consent . . . is an intervening act free of police exploitation of the primary illegality and is sufficiently distinguishable from the primary illegality to purge the evidence of the primary taint."  Response at 10 (quoting United States v. Carson, 793 F.2d 1141, 1147-48 (10th Cir. 1986)).  The United States asserts that, because Chavez consented to the officers' search of his room after he had been read his rights pursuant to Miranda v. Arizona, and because the officers' questioning was not forceful or coercive in tone or language, his consent, the search for the firearm, and the officers' discovery of the firearm were free from any taint if the original search of the home was unlawful.  See Response at 10-11.  The United States thus asks the Court to find that the officers' search of the home was lawful and that the officers lawfully recovered the firearm.  See Response at 11.

At the suppression hearing, Chavez argued that "this case is indicative of what the framers of the [C]onstitution and the [A]mendments feared when there's an intrusion into a home . . . ."  Feb. 6 Tr. at 155:9-13 (de la Garza).  The Court asked Chavez if he agrees that the case turns on whether Orphan had apparent authority to grant the officers consent to enter the home and, if so, whether he did grant such consent.  The Court asked whether Chavez agrees that the

second prong, whether consent was granted, depends upon whether the Court accepts Orphan's statement that he did not grant such consent or the officers' statements that he did.  See Feb. 6 Tr. at 155:1-156:6 (Court).  Chavez replied that he agrees.  He is arguing, first, that Orphan never consented to the search, and second, that, if he did, he did not have apparent or actual authority to do so.  See Feb. 6 Tr. at 156:7-17 (de la Garza).  Chavez conceded that, "I think the Government under [United States v. Sanchez, 608 F.3d 685 (10th Cir. 2010)] has met the[] first prong, indicating that the consent was [unequivocally] freely given."  Feb. 6 Tr. at 157:3-6.  Chavez asserted that the "issue . . . on defense's behalf, Your Honor, is whether or not there was any implied coercion in this case. . . . [and that] law enforcement is not at liberty to rely solely on ambiguous facts."  Feb. 6 Tr. at 157:7-21 (de la Garza, Court).  The Court asked where Chavez finds ambiguity in the facts, noting that it is not as if the police walked up to the front door and found a baby-sitter or plumber who then consented; rather, the officers came to the house, and Orphan tried to get in the house and then said that it is where he was living.  See Feb. 6 Tr. at 157:22-158:6 (Court).  Chavez replied that the ambiguity lies in the inconsistency of Rock's statements in the state criminal complaint and also whether there was "implied coercion" in obtaining consent.  Feb. 6 Tr. at 158:8-16 (de la Garza).  Chavez stated that his argument boils down to two points: that Orphan never gave officers the statements to which they testified; if he did, he did not do so freely or voluntarily.  See Tr. at 158:23159:4 (de la Garza).  Chavez noted that he is also arguing that Chavez' consent to search his room after police were in the house was coerced and that time was not of the essence in searching inside the house.  See Feb. 6 Tr. at 159:14-25 (De la Garza, Court).  The Court responded by asking Chavez whether time mattered, because once he gave officers consent to search his room for the gun, "it didn't matter . . . . if

-34-

somebody wants to let them look at their house and look in shoe boxes and get down [underneath] the bed, they can give that consent, right?"  Feb. 6 Tr. at 160:19-23 (Court). Chavez responded that the Court was "correct," as long as the consent is voluntarily given, which he contends that it was not in this case.  Feb. 6 Tr. at 160:25-161:2 (Court, de la Garza).

The United States noted that it is advancing three theories why the evidence of Chavez' possession of the firearm was legally obtained: (i) Orphan's consent, which he had apparent authority to give, justifies the officers' entry into the house; (ii) a security sweep subsequent to Crain's arrest justifies the officers' entry into the house; and (iii) Chavez' consent provided to the officers to search his room eliminates any taint.  See Feb. 6 Tr. at 164:13-21 (Rowley).  The Court asked the United States whether it is arguing that Orphan had actual authority to grant the officers consent to enter Chavez' residence.  See Feb. 6 Tr. at 165:2-3 (Court).  The United States conceded that it is not so arguing, because it lacks the necessary proof to meet its burden: "We think that he did have actual authority, however we recognize that [we] do not [] have sufficient evidence of actual authority[.]  [T]herefore we are [] arguing for apparent authority." Feb. 6 Tr. at 165:7-10 (Rowley).  The Court asked how Chavez' consent inside the home would cut off any unlawful or coerced consent that Orphan provided officers in the driveway.  See Feb. 6. Tr. at 164:22-24 (Court).  The United States responded that the gun would not have been discovered but for Chavez' consent, as Chavez told the officers there was a gun only after being read his rights under Miranda v. Arizona, and then officers found the gun after Chavez explained a second time where it was located.  See Feb. 6 Tr. at 165:15-166:3 (Rowley).  The United States asserted that, while any detention, including Orphan's, has a coercive element to it, the Tenth Circuit, in United States v. Doe, held, in a case in which there were more coercive elements than

-35-

here, that detention does not overpower a person's ability to voluntarily and freely consent to a search.  See Feb. 6 Tr. at 166:4-22 (Rowley).  It conceded that Orphan gave his consent while there were three officers outside who had, minutes before, wielded their weapons in connection with Orphan's detention, that at the time Orphan gave his consent, neither Barahona's tone nor his demeanor were authoritative, and all the officers testified that Orphan was relaxed and his "testimony did not indicate any duress.  He testified that he didn't want to make it worse.  He said that he wanted to cooperate and did not want to make it worse."  Feb. 6 Tr. at 166:23-167:16 (Rowley).  The United States pointed out that, not only did he answer all of Barahona's questions, but that "he was able to expand upon their questions.  He said not just that there were two individuals but he said who they were and their relationship to one of those individuals."  Feb. 6 Tr. at 167:24-168:5 (Rowley).  It asserted that, whereas the Tenth Circuit has stated that the touchstone for Fourth Amendment inquiries is reasonableness, the officers acted reasonably at all times during the investigation and in interviewing both Orphan and Chavez.  See Feb. 6 Tr. at 158:6-170:3 (Rowley).  The United States contended that the Court should thus deny Chavez' Suppression Motion.  See Feb. 6 Tr. at 170:3-5 (Rowley).

Chavez replied that, in regard to the testimony, it is his position that there were so many ambiguities in reference to the testimony -- "one agent would give in reference to the other agent and little purposes and little facts in reference to whether or not the safeguards, the constitutional safeguards in this case" were followed.  Feb. 6 Tr. 170:9-16 (de la Garza).  Chavez asserted that the United States had ample time to request a search warrant be issued, but for some reason declined to do so.  Because they did not obtain a search warrant, and because they did not have proper consent to enter Chavez' residence, all the evidence, including both the guns and drug

paraphernalia, are fruit of the poisonous tree.  See Feb. 6 Tr. at 170:20-171:3 (de la Garza).

Chavez asked that the Court therefore exclude all evidence from Chavez' residence as fruits of

an illegal search.  See Feb. 6 Tr. at 171:3-5 (de la Garza).  Before concluding, the Court asked

whether the United States was asserting any basis other than Chavez' consent for legally

obtaining the firearm, such as exigent circumstances.  See Feb. 6 Tr. at 171:6-11 (Court).  The

United States responded that Chavez' consent is the only argument it is making at this time for

legally obtaining the weapon.  See Feb. 6 Tr. at 171:12-16 (Rowley, Court).

## RELEVANT FORTH AMENDMENT LAW REGARDING HOME SEARCHES

The Fourth Amendment to the United States Constitution "protects '[t]he right of the

people to be secure in their person, houses, papers, and effects, against unreasonable searches

and seizures.'"  United States v. Thompson, 524 F.3d 1126, 1132 (10th Cir. 2008)(quoting U.S.

Const. amend. IV).  It also commands that "no Warrants shall issue, but upon probable cause,

supported by Oath or affirmation, and particularly describing the place to be searched, and the

persons or things to be seized."  U.S. Const. amend. IV.  "The security of one's privacy against

arbitrary intrusion by the police -- which is at the core of the Fourth Amendment -- is basic to a

free society."  Wolf v. Colorado, 338 U.S. 25, 27 (1949), overruled on other grounds by Mapp v.

Ohio, 367 U.S. 643 (1961).

"[T]he Fourth Amendment protects people, not places," and the Supreme Court of the

United States has vigorously asserted that the proper analysis under the Fourth Amendment is

not whether the place searched is a "constitutionally protected area."  Katz v. United States, 389

U.S. 347, 351 (1967).  The proper inquiry is whether the defendant had an expectation of privacy

in the place searched and whether that expectation was objectively reasonable.  See Katz v.

United States, 389 U.S. at 351 ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.  But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected."); Katz v. United States, 389 U.S. at 361 (Harlan, J., concurring)("My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'").

There is no doubt, however, that a citizen has a reasonable expectation of privacy, and a particularly strong one, in his own home.   The "chief evil" from which the Fourth Amendment protects citizens is unwanted police entry into the home, and the "principal protection" is "the Fourth Amendment's warrant requirement." United States v. Thompson, 524 F.3d at 1132.  See Kyllo v. United States, 533 U.S. 27, 31 (2001)("'At the very core' of the Fourth Amendment 'stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'")(quoting Silverman v. United States, 365 U.S. 505, 511 (1961)); Payton v. New York, 445 U.S. 573, 586 (1980)("[S]earches and seizures inside a home without a warrant are presumptively unreasonable.").  "A warrantless search of a home in presumptively unreasonable, and evidence obtained from such a search is inadmissible, subject only to a few carefully established exceptions." United States v. Harrison, 639 F.3d 1273, 1278 (10th Cir. 2001).

1.     **Search Warrants Require Probable Cause.**

The Supreme Court requires that a magistrate judge be provided information sufficient to determine the existence of probable cause before he or she issues a warrant.  See Illinois v.

Gates, 462 U.S. 213, 239 (1983).   A magistrate judge must consider the totality of the circumstances described in the warrant affidavit to determine probable cause, which exists when there is "a 'fair probability' that contraband or other evidence will be found in a particular place."   United States v. Bigelow, 562 F.3d 1272, 1280-81 (10th Cir. 2009)(quoting Illinois v. Gates, 462 U.S. at 238). A magistrate judge's decision to issue a search warrant may not be solely a ratification of the law-enforcement officials' conclusion that a suspect has committed a crime; rather, affidavits supporting a search-warrant request must provide the magistrate judge with a substantial basis on which to issue a warrant.   See United States v. Bigelow, 562 F.3d at 1281; United States v. Prince, 593 F.3d 1178, 1186 (10th Cir. 2010)("An affidavit submitted in support of a search warrant must provide the magistrate with a substantial basis for determining the existence of probable cause.")(internal quotation marks omitted).   In other words, the magistrate judge must perform his or her own unbiased and independent review of the facts presented.   See United States v. Leon, 468 U.S. 897, 914 (1984).

To assure that warrants are not based on bare conclusions, the Supreme Court has mandated that the courts "conscientiously review the sufficiency of affidavits on which warrants are issued."   Illinois v. Gates, 462 U.S. at 239.   See United States v. Biglow, 562 F.3d at 1281. A magistrate judge's finding of probable cause is nevertheless given great deference, with the court's role in reviewing the probable-cause finding limited to the sufficiency of the warrant affidavit; the Supreme Court prohibits after-the-fact de novo scrutiny of the probable-cause determination.   See United States v. Biglow, 562 F.3d at 1281 (quoting Illinois v. Gates, 462 U.S. at 238-40, and Massachusetts v. Upton, 466 U.S. 727, 733 (1984)).

2.    **Warrantless Searches: Limited Fourth Amendment Exceptions**.

Not all searches require a warrant.  The Supreme Court has instructed that, when assessing the reasonableness of a warrantless search, a court must begin "with the basic rule that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions.'"  Arizona v. Gant, 129 S. Ct. 1710, 1716 (2009)(citing Katz v. United States, 389 U.S. at 357).  See Payton v. New York, 445 U.S. at 586. As the United States Court of Appeals for the Tenth Circuit stated in United States v. Cos, 498 F.3d 1115 (10th Cir. 2007): "A warrantless search of a suspect's home is per se unreasonable under the Fourth Amendment unless the government can show that it falls within 'one of a carefully defined set of exceptions.'"  498 F.3d 1115, 1123 (quoting Coolidge v. New Hampshire, 403 U.S. 443, 474 (1971)).  See United States v. Thompson, 524 F.3d at 1132.

a.    **Consensual Searches.**

Searches conducted pursuant to consent constitute one exception to the Fourth Amendment's search-warrant and probable-cause requirements.  See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  When an individual consents to a police search, and the consent is "freely and voluntarily given," the search does not implicate the Fourth Amendment.  United States v. Peña, 143 F.3d at 1366 (quoting Schneckloth v. Bustamonte, 412 U.S. at 219).  The Tenth Circuit directs that voluntariness should be determined under the totality of the circumstances, and has provided a two-part test for determining voluntariness, which requires that the government "(1) 'proffer clear and positive testimony that consent was unequivocal and specific and intelligently given,' and (2) the officers must have used no 'implied or express

duress or coercion.'"   United States v. Sanchez, 608 F.3d 685, 690 (10th Cir. 2010)(quoting

United States v. Taverna, 348 F.3d 873, 878 (10th Cir. 2003)).  The government bears the burden

of proving that the consent was freely and voluntarily given.  See Florida v. Royer, 460 U.S. 491,

497 (1983)("[W]here the validity of a search rests on consent, the State has the burden of

proving that the necessary consent was obtained and that it was freely and voluntarily given, a

burden that is not satisfied by showing a mere submission to a claim of lawful authority.").

Whether a party's consent was free and voluntary is a question of fact to be determined

from the totality of the circumstances.  See United States v. Peña, 143 F.3d at 1366.  The

Supreme Court and the Tenth Circuit have developed a non-exhaustive list of factors that courts

should consider when trying to determine whether a defendant's consent was voluntarily given:

> (i) the threatening presence of several officers; (ii) the use of aggressive language
> or tone of voice indicating that compliance with an officer's request is
> compulsory, or, conversely, the officer's pleasant manner and tone of voice; (iii)
> the prolonged retention of a person's personal effects such as identification, or,
> conversely, the prompt return of the defendant's identification and papers; (iv) the
> absence of other members of the public, or, conversely, whether the stop occurs in
> a public location such as the shoulder of an interstate highway, in public view; (v)
> the officer's failure to advise the defendant that [he or] she is free to leave; . . .
> (vi) the display of a weapon[;] and (vii) physical touching by the officer.

United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *12 (D.N.M. Feb. 19, 2010)

(Browning, J)(quotations, alterations, and citations omitted).  See United States v. Fox, 600 F.3d

1253, 1258 (10th Cir. 2010); United States v. Ledesma, 447 F.3d 1307, 1314 (10th Cir. 2006);

United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997).

Because courts are required to look at the totality of the circumstances in determining

whether an individual's consent was voluntary, see United States v. Peña, 143 F.3d at 1366, no

one factor is dispositive in a court's inquiry into the circumstances.  For example, although an

officer's failure to advise a defendant that he or she is free to leave might suggest that coercive law-enforcement conduct caused the defendant's consent to search, the Supreme Court has ruled that officers do not need to advise an individual of his or her right to refuse to consent to a search for that individual's consent to be voluntary.  See Schneckloth v. Bustamonte, 412 U.S. at 232. Moreover, the mere presence of officers by exits to a building, threatening no more than to question individuals if they seek to leave, "should not [result] in any reasonable apprehension by any [individual] that they would be seized or detained in any meaningful way."  United States v. Drayton, 536 U.S. 194, 205 (2002)(internal citations omitted).  Additionally, an officer's display of a weapon may contribute to the coercive nature of a situation, but "[t]he presence of a holstered firearm [] is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon."  United States v. Drayton, 536 U.S. at 205.   "[I]t is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced.  It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches."  Schneckloth v. Bustamonte, 412 U.S. at 232.

> **b.    Third-Party Consent.**

A third-party's consent can sometimes justify police entry and search of a suspect's property.  The Tenth Circuit has ruled that, when a third party who possesses either actual or apparent authority to consent to a search grants law-enforcement officers such consent, the search is lawful despite the lack of a search warrant.  See United States v. Cos, 498 F.3d at 1124; United States v. Kimoana, 383 F.3d 1215, 1221 (10th Cir. 2004).  Like consent originating from the defendant or suspect, third-party consent must be freely and voluntarily given, as determined

from the totality of circumstances.  See United States v. Sanchez, 608 F.3d at 689.  Additionally, for the consent to be valid, a consenting third-party "must have had actual or apparent authority to do so."  United States v. Sanchez, 608 F.3d at 689 (quoting United States v. Thompson, 524 F.3d at 1132)(internal alterations omitted).  "It is the government's burden to establish by a preponderance of the evidence that the consenter had [authority to consent to the search of a suspect's bedroom]."  United States v. Rith, 164 F.3d 1323, 1329 (10th Cir. 1999) (quoting United States v. McAlpine, 919 F.2d 1461, 1463 (10th Cir. 1990)).  See United States v. Cos, 498 F.3d at 1124.

### (i)　　　**Actual third-party authority.**

The Tenth Circuit has held that "a third party has [actual] authority to consent to a search of property if that third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it."  United States v. Cos, 498 F.3d at 1126 (quoting United States v. Rith, 164 F.3d at 1329).  See United States v. Matlock, 415 U.S. 164, 172 n.7 (1974); United States v. Dozal, 173 F.3d 787, 792 (10th Cir. 1999).  Third-party consent cases are based on the relationship between a consenter and the property searched.  See United States v. McAlpine, 919 F.2d 1461, 1464 (10th Cir. 1990).  "Mutual use of property by virtue of joint access is a fact-intensive inquiry," and where a court finds that a third party residing full-time on the premises enters "the premises or room at will, without the consent of the subject of the search," joint access exists with respect to that third-party.  United States v. Rith, 164 F.3d at 1329-30.  "[C]ontrol for most purposes of property," on the other hand, "is a normative inquiry dependent upon whether the relationship between the defendant and the third party is the type which creates a presumption of control for most purposes over the property by the third party."

United States v. Rith, 164 F.3d at 1330.  The government bears the burden of establishing that one who consented to the search of a property had actual authority to do so.  See Illinois v. Rodriguez, 497 U.S. 177, 181 (1990); United States v. Rith, 164 F.3d at 1328.[1]

The relationship between a third-party and the defendant objecting to a search may "bear on the nexus between the consenter and the property."  United States v. McAlpine, 919 F.2d at 1464.  In the Tenth Circuit, certain relationships between the third-party and a defendant give rise to a presumption that the third-party has control for most purposes.  See United States v. Rith, 164 F.3d at 1330.  If the relationship between the defendant and the third party "creates [] a presumption of control [for most purposes] and is unrebutted, the third party has authority to consent to a search of the property."  United States v. Rith, 164 F.3d at 1330.  The Tenth Circuit has ruled that husband-wife and parent-child relationships support the presumption of control for most purposes, while landlord-tenant relationships tend to rebut it.  See United States v. Rith, 164 F.3d at 1330-31.  In United States v. Rith, the Tenth Circuit recognized that parent-child relationships give rise to such a presumption, even where the "child" is legally an adult.  164 F.3d at 1327, 1330.  Thus, if an adult defendant's parent, with whom the defendant lives, gives officers consent to search the premises, the officers are authorized to search the adult defendant's room unless there exist facts to rebut the presumption that the parent has the power to grant such authority.  The Tenth Circuit has declined to find actual authority in the case of "mutual use by an occasional visitor to an apartment . . . ."  United States v. Cos, 498 F.3d at 1126 (citing United States v.  Sanchez, 608 F.3d at 689).  The Tenth Circuit requires "the government to show that

---

[1] Some earlier decisions use the term "common" authority to refer to what is now called "actual" authority.  Compare Illinois v. Rodriguez, 497 U.S. at 177, with United States v. Rith, 164 F.3d at 1330.

the third party entered the premises or room at will, without the consent of the subject of the search." United States v. Cos, 498 F.3d at 1125-26. See United States v. Warner, 843 F.2d 401, 403 (9th Cir. 1988)(affirming the district court's finding that a landlord lacked actual authority to consent to a search of a tenant's property because, "at best, the landlord had permission to enter the property for the limited purpose of making specified repairs and occasionally mowing the lawn"); United States v. Corral, 339 F. Supp. 2d 781, 791-92 (W.D. Tex. 2004)(holding that a part-time housekeeper lacked actual authority to consent to a search of the defendant's residence, because she "enjoyed only limited access to the residence," "was present for specific and limited purposes only," "did not have a key, and never let others into the house no had permission to do so")(cited in United States v. Cos, 498 F.3d at 1127-28).

Even where a relationship gives rise to a presumption of control over the property, the presumption can be "rebutted by facts showing an agreement or understanding between the defendant and the third party that the latter must have permission to enter the defendant's room." United States v. Rith, 164 F.3d at 1331. Factors which may rebut the presumption of control for most purposes include: (i) whether the defendant paid rent to the third party; (ii) a lock on the bedroom door; and (iii) an explicit or implicit agreement that the third party never enter a particular area. See United States v. Rith, 164 F.3d at 1331 (citing Stoner v. California, 376 U.S. 483, 489-90 (1964); United States v. Morning, 64 F.3d 531, 536 (9th Cir. 1995); United States v. Kinney, 953 F.2d 863, 866 (4th Cir. 1992); and United States v. DiPrima, 472 F.2d 550, 551 (1st Cir. 1973)).

### (ii)    **Apparent third-party authority.**

If a third party lacks actual authority to grant consent to the search of property or

premises that a defendant occupies, authority may nevertheless exist under the doctrine of apparent authority.  A third-party's "[a]pparent authority arises from the reasonable, albeit erroneous, belief that the third party has the authority to provide valid consent." United States  v. Sanchez, 608 F.3d at 689.  See United States v. Thompson, 524 F.3d at 1133.  "The apparent authority inquiry is an objective one: we must determine whether 'the facts available to the officer at the moment . . . warrant a man of reasonable caution [to believe] that the consenting [individual] had authority over the premises[.]'" United States v. Cos, 498 F.3d at 1128 (quoting Illinois v. Rodriguez, 497 U.S. at 188)(internal quotation marks and citations omitted).  A third party has apparent authority "if the officer has a reasonable belief that the third party has '(1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it.'" United States v. Cos, 498 F.3d at 1128 (quoting United States v. Rith, 164 F.3d at 1329).  "Even where actual authority is lacking . . . a third party has apparent authority to consent to a search when an officer reasonably, even if erroneously, believes the third party possesses authority to consent." United States v. Andrus, 483 F.3d 711, 716 (10th Cir. 2007)(holding that defendant's father had apparent authority to consent to search of defendant's computer).  "[T]o satisfy the 'reasonableness' requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government . . . is not that they always be correct, but that they always be reasonable." United States v. Andrus, 483 F.3d at 716.  The "reasonableness" requirement allows for officers to be mistaken in their assessment of a situation when executing their duties, as long as their mistakes are "those of reasonable men, acting on facts leading sensibly to their conclusions of probability." Williams v. United States, 323 F.2d 90, 94 n.5 (10th Cir. 1963)(quoting Brinegar v. United States, 338 U.S.

160, 176 (1949)).

Officers are not at liberty to rely on apparent authority when "ambiguous facts related to authority" are present.   United States v. Kimoana, 383 F.3d at 1222.   In ambiguous circumstances, agents are required to "investigate further before relying on the consent," or the government will have failed to meet its burden to demonstrate apparent authority.   United States v. Kimoana, 383 F.3d at 1222 (finding that consent given by third party was valid where a third party told officers that a motel room was not his, but the officers knew that the third party had a key to the room and stayed there with relatives).   For instance, "a third party's mere presence on the premises to be searched is not sufficient to establish that a man of reasonable caution would believe that she had 'mutual use of the property by virtue of joint access, or . . . control for most purposes over it.'"   United States v. Cos, 498 F.3d at 1129 (quoting United States v. Rith, 164 F.3d 1329).   See 4 Wayne R. LaFave, Search and Seizure § 8.3(g) (4th ed. 2004)("It is a perversion of the apparent authority doctrine . . . to hold that police may reasonably conclude that a person known to be a babysitter 'had the authority' to permit a full search of the premises 'which she purported to have.'")(quoting People v. Misquez, 152 Cal. App. 2d 471, 313 P.2d 206 (1957)).   Professor Wayne LaFave has observed,

> [U]nder a sound application of the apparent authority rule the police must be required to make reasonable inquiries when they find themselves in ambiguous circumstances. . . .   This does not mean that the police must contest every claim of authority . . . .   [I]n some circumstances the claim of authority can be reasonably relied upon by the police precisely because of the silence of another person present who could be expected to object were that claim in error. . . .   But sometimes the facts known by police cry out for further inquiry, and when this is the case it is not reasonable for the police to proceed on the theory that "ignorance is bliss."

4 W. LaFave, supra, at 177-180.

-47-

3.      **The Plain-View Doctrine.**

Evidence or items of contraband discovered in plain view by an officer who is legitimately on the premises are admissible as evidence.  See Georgia v. Randolph, 547 U.S. 103, 137-38 (2006)(Roberts, J., dissenting)("The normal Fourth Amendment rule is that items discovered in plain view are admissible if the officers were legitimately on the premises; if the entry and search were reasonable 'as to' [the defendant], based on her consent, [the evidence should be admissible].").  Evidence which is recovered during "a truly cursory inspection -- one that involves merely looking at what is already exposed to view, without disturbing it -- is not a 'search' for Fourth Amendment purposes, and therefore does not even require reasonable suspicion."  Arizona v. Hicks, 480 U.S. 321, 328 (1987).  As such, a visual inspection of what is in plain view does not constitute a search.  See United States v. Nicholson, 144 F.3d 632, 636 (10th Cir. 1998).  "An officer, therefore, does not violate a person's Fourth Amendment rights if the officer is not executing a search warrant, but discovers evidence in plain view, so long as the officer is lawfully on the premises."

## ANALYSIS

Chavez asks the Court to suppress the evidence found in Chavez' home.  Chavez asserts that: (i) Orphan did not give consent to enter the home; (ii) even if Orphan gave consent, any consent was coerced; (iii) even if Orphan gave consent, he lacked authority.  Chavez is incorrect.  Orphan gave the officers and agents consent.  This consent was valid, because Orphan freely and voluntarily gave the consent, and gave the consent with apparent authority.

## I.      THE COURT FINDS THAT UNITED STATES' WITNESSES ARE MORE CREDIBLE THAN ORPHAN.

Orphan testified that the officers "never asked for permission to enter the property" and

that he "didn't" ever give them permission to do so.  Feb. 5 Tr. at 99:21-24 (de la Garza, Orphan).  Barahona, Kepf, and Spruell, however, all testified that they heard Orphan give permission to the officers to go inside the house.  The amount of experience that the agents and officers involved in Operation Forsaken had in executing arrest warrants counsels in favor of accepting as fact their recollection of the events.  As of April 3, 2012, for example, Barahona had executed at least one hundred arrest warrants, see Feb. 5 Tr. at 60:8 (Barahona), Martin had executed over "hundreds," Feb. 6 Tr. at 3:8 (Martin), and Kepf had executed "probably 50 to 60" arrest warrants, Feb. 6 Tr. at 57:11 (Kepf).  Both Barahona and Kepf testified that, in execution of arrest warrants, they had asked and not received consent to enter a home, and Barahona testified that, in such situations, he "stop[s] the search there and then.  I honor the subject's right and seek out a search warrant if needed."  Feb. 5 Tr. at 60:19-20 (Barahona).  Although, on the one hand, the number of arrest warrants they execute might cause them to forget some specific details about executing particular search warrants, on the other hand, through experience and training, the officers very likely know that they need legally effective consent to search a premises for which they do not have a search warrant, and know key words and phrases for which to listen in interrogations to ensure that such consent is properly obtained.  Importantly, there is no contention here that officers had a search warrant for Chavez' residence at 1301 Pear Grove.  The Court does not believe Barahona, Kepf, and Spruell, given their experience, would all misremember gaining the consent that they needed to enter the home without a search.

The Court also concludes that Orphan's contention, on its face, is not credible, because the statement he contends that he made with officers is not easily believable in context.  One of Chavez' primary arguments, which he contended at the hearing is at the heart of his case for

suppressing the fruits of the search, is that, if Orphan consented to the entry of the residence, his consent was coerced, as "he was submitting to authority because he felt threatened and coerced." Suppression Motion at 4.  Such an assertion is inconsistent with Orphan stating to officers that the residence at 1301 Pear Grove is not his "permanent place of residence."  Feb. 5 Tr. at 99:9-10 (Orphan).  It is more plausible that, while the officers interrogated him, Orphan would have stated perhaps that he did not "live here permanently."  Or, it might be more plausible if he would have asserted at the hearing that, when police asked him if he lived there, he answered by telling the officers that it was a place he stayed off and on with his girlfriend only, rather than qualifying that he told police it was his "permanent place of residence," which is a legal buzz phrase.  Even where all accounts of Barahona's questioning of Orphan show that both were relaxed, and the tone was conversational, the Court does not find credible that Orphan told the officers, in response to Barahona asking if he "lived," Feb. 5 Tr. at 59:19-21 (Barahona), at 1301 Pear Grove, it was his "permanent place of residence," Feb. 5 Tr. at 99:9-10 (Orphan).

Additionally, Orphan's prior criminal history cuts against giving his testimony credence over that of the officers' testimony.  On cross-examination, Orphan admitted that he was arrested for burglary of a vehicle in 2009 and pled guilty to that offense in 2010.  While a criminal record alone would not necessarily preclude finding a person's testimony credible when compared with that of three officers' testimony, Orphan further admitted that he was twice untruthful in his interaction with police officers during his arrest for the incident.  First, when a police officer approached him in the course of the burglary, Orphan supplied the officer with a false name. Moreover, during cross-examination at the suppression hearing, when asked whether he lied to the officer about his name, Orphan twice said that he "withheld [his] name."  Feb. 5 Tr. at

104:17, 104:19 (Orphan).  It was only when asked on cross-examination whether Orphan "said [his] name was [S]haken [G]ade" that he admitted "[a]t that point I think I did give him a false name."  Feb. 5 Tr. at 104:20-22 (Rowley, Orphan).  Second, Orphan was untruthful with police officers when the officer asked Orphan if he was burglarizing the vehicle.  At the suppression hearing for this case, he admitted that, rather than admitting that he was burglarizing the car at the scene, he told officers that "the vehicle was a complete loss . . . .  I was there to [] help someone out with the vehicle."  Feb. 5 Tr. at 105:9-11 (Orphan).  These instances of untruthfulness both took place during police interrogation.  Moreover, both of these untruths Orphan provided to the officer at the scene of the burglary were self-serving statements, which, if true, would likely have exculpated him.  Orphan thus had an important self-interest in providing to officers these untruths.   Here, while Orphan is not a co-Defendant in the United States' case against Chavez, Orphan was found on the property and is alleged to have been living inside the Chavez' home, where drugs and drug paraphernalia are alleged to have been found in plain sight.  If Orphan's statements were found to be more credible than those of the other witnesses in this case, and the Court were to find accordingly that the officers entered the home without his consent, that might lead the Court to conclude that much of the evidence found in search of the home is fruit of an illegal search and should be suppressed.  The record does not disclose what charges Orphan faces, if any, and whether anything found in the officers' search of Chavez' residence is connected to or evidence for those charges, but it is possible that Orphan could benefit if the Court found the search of the residence unlawful, and required the drugs and paraphernalia found in the home to be suppressed.  At a minimum, his testimony could help Chavez, a friend whom let Orphan and his girlfriend stay at Chavez' home rent-free.  If the Court

thus accepts Orphan's testimony that he told police that he lived there with his girlfriend, but added that "it wasn't my permanent place of residence. . . .  It was just a place we stayed like I said off and on," Feb. 5 Tr. at 99:9-12 (Orphan, de la Garza), it would be giving credence to statements that are self-serving in the same manner as were his untruths to the police officer in 2009.  The Court declines to do so, and thus finds that the officers' testimony is more credible than Orphan's.

## II.       THE UNITED STATES HAS MET ITS BURDEN TO SHOW CONSENT.

Chavez contends that, because the officers' intrusion into his home was unlawful under the Fourth Amendment, the Court must suppress the fruits of the lawful entry.  Warrantless entry into Chavez' residence would be justified only if the search passes muster under the Fourth Amendment, no matter how limited in scope.  See, e.g., Payton v. New York, 445 U.S. at 582 n.17 ("Inasmuch as the purpose of the Fourth Amendment is to guard against arbitrary governmental invasions of the home, the necessity of prior judicial approval should control any contemplated entry, regardless of the purpose for which that entry is sought."); id. at 585-86 ("[T]he 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'")(quoting United States v. U.S. District Court, 407 U.S. at 313). Accord United States v. Najar, 451 F.3d at 717 ("[U]nless an exception to the warrant requirement applies, the officers' entry into Najar's home is presumptively unreasonable under the Fourth Amendment. The government bears the burden of proving the exigency exception  . . . . [which] is especially heavy when the exception must justify the warrantless entry of a home."); United States v. Davis, 290 F.3d at 1242 ("With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered

no.")(quoting Kyllo v. United States, 533 U.S. 27, 31 (2001)).

### A.    ORPHAN GAVE CONSENT.

Orphan and Chavez deny that Orphan gave consent to search the residence.  The United States asserts that Orphan provided consent to enter the house to Barahona as he questioned Orphan outside the residence. While Chavez denies that Orphan consented to entry into the house, and Orphan has testified that he did not give consent, the Court finds that Orphan consented.

A third-party's consent can sometimes justify police entry and search of a suspect's property.  The Tenth Circuit has ruled that, when a third party who possesses either actual or apparent authority to consent to a search grants law-enforcement officers such consent, the search is lawful despite the lack of a search warrant.  See United States v. Cos, 498 F.3d at 1124; United States v. Kimoana, 383 F.3d at 1221.  Like consent originating from the defendant or suspect, third-party consent must be freely and voluntarily given, as determined from the totality of circumstances.  See United States v. Sanchez, 608 F.3d at 689.  Additionally, for the consent to be valid, a consenting third-party "must have had actual or apparent authority to do so." United States v. Sanchez, 608 F.3d at 689 (quoting United States v. Thompson, 524 F.3d at 1132)(internal alterations omitted).

Officer Rock was not present for the conversation with Orphan.  He had given chase to Crain and did not return until after the events at issue took place.  Because he did not personally observe these events, Officer Rock gives only a short summary in his affidavit in the Statement of Probable Cause.  His description is that "[the] other Agents knocked on the front door and contacted several other people in the house.  One subject was Robert Chavez (DOB [ ]).  Chavez

gave us consent to search his room." Statement of Probable Cause, Defendant's Ex. A3. He does not state, as Chavez asserts, that "Chavez came to the door and agreed to allow the officers to enter." Suppression Motion at 3. Kepf and Barahona both testified that Barahona then asked for and received permission to go into the residence and look for Chavez and Bosco. See Feb. 5 Tr. at 60:1-3 (Barahona)("I asked [] Mr. Orphan may we go inside and find these people in there?  Mr. Orphan [] stated yes and we were able to go inside."); Feb. 6 Tr. at 63:11-19 (Rowley, Kepf)("Officers asked him if we could go inside the residence and he said yes."  Q: "And did you hear him say yes?"  A: "Yes. . . . [I was] [m]aybe six to ten feet [away].").  Because the Court has concluded that the officers' testimony is more credible than Orphan's on the issues of consent, the Court accepts the officers' testimony that Barahona received Orphan's consent to go inside the residence and look for Chavez and Bosco.  The Court thus concludes that Orphan gave the officers consent to enter the residence at 1301 Pear Grove.

### B.    THE CONSENT WAS VOLUNTARY.

Chavez contends that the consent was not voluntary. Chavez contends that, at best, Orphan was submitting to authority, because he felt threatened and coerced.  "The voluntariness of consent must be determined from the totality of the circumstances, and the government bears the burden of proof on the issue."  United States v. Soto, 988 F.2d 1548, 1557 (10th Cir. 1993)(citing United States v. Price, 925 F.2d 1268, 1271 (10th Cir. 1991)).  The United States has met its burden to show that the officers obtained the necessary consent.

Whether a party's consent was free and voluntary is a question of fact to be determined from the totality of the circumstances.  See United States v. Peña, 143 F.3d at 1366. Voluntariness should be determined under the totality of the circumstances, which requires that

the government "(1) 'proffer clear and positive testimony that consent was unequivocal and specific and intelligently given,' and (2) the officers must have used no 'implied or express duress or coercion.'"  United States v. Sanchez, 608 F.3d at 690 (quoting United States v. Taverna, 348 F.3d at 878).  The Supreme Court and the Tenth Circuit have developed a non-exhaustive list of factors that courts should consider when trying to determine whether a defendant's consent was voluntarily given:

> (i) the threatening presence of several officers; (ii) the use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory, or, conversely, the officer's pleasant manner and tone of voice; (iii) the prolonged retention of a person's personal effects such as identification, or, conversely, the prompt return of the defendant's identification and papers; (iv) the absence of other members of the public, or, conversely, whether the stop occurs in a public location such as the shoulder of an interstate highway, in public view; (v) the officer's failure to advise the defendant that [he or] she is free to leave; . . . (vi) the display of a weapon[;] and (vii) physical touching by the officer.

United States v. Sedillo, 2010 WL 965743, at *12 (quotations, alterations, and citations omitted).

In United States v. Romero, the Court went through the list of factors provided in United States v. Sedillo, and found that the third party, O. Martinez, freely and voluntarily gave his consent to "four government agents wearing bullet-proof vests" that came to the front door. United States v. Romero, 743 F. Supp. 2d at 1321-22.  The Court reasoned:

> O. Martinez opened the door on April 16, 2009 to four government agents wearing bullet-proof vests, weighing in favor of finding O. Martinez' consent involuntary. On the other hand, although O. Martinez felt the situation was "tense," the record indicates that the agents were professional, and did not use aggressive language or tone of voice to suggest that compliance with their request to enter was compulsory.  Both O. Martinez and [and the government agent] testified that O. Martinez freely cooperated with the agents' request to search the residence, even though O. Martinez was not told that the search was necessary to ensure the agents' safety while executing their search warrant.  The agents did not demand or retain O. Martinez' personal effects, which weighs in favor of finding the consent voluntary.  Although the record does not allege that the agents advised O. Martinez that he was be free to leave, neither did the agents attempt to detain

> O. Martinez or to otherwise keep him from going to work on April 16.  Finally, while the agents were armed, they had their weapons holstered or otherwise stowed at all times during the encounter; they were not brandishing their weapons in a manner that would intimidate O. Martinez.

743 F. Supp. 2d at 1321-22 (internal references omitted).  In regard to the second prong -- whether the officers used implied or express duress or conclusion -- the Court found that they did not.  The Court reasoned:

> The agents were armed, but the record does not indicate that they used or displayed their weapons in a way that might intimidate O. Martinez into consenting to a search.  [The agent] testified that the agents were following normal practice in coming to the residence armed, and that the agents, other than Grout, kept their weapons holstered throughout their encounter with O. Martinez. Grout's weapon was too large to holster, so it was slung over his shoulder instead. Having a holstered or slung weapon does not -- without more -- render a law-enforcement officer's request for entry coercive, or nearly every such request would be coerced; for law-enforcement officers, firearms are standard equipment. There were five agents present, which may have contributed to the coerciveness of the situation, but the presence of several agents in and of itself does not render a citizen's consent coerced.  Finally, although the agents did not expressly advise O. Martinez that he could refuse, the Supreme Court has clearly held that agents need not advise an individual of his or her right to refuse to consent to a search for that individual's consent to be valid. The Court finds that O. Martinez' consent to the agents' search was not coerced or given under duress.

743 F. Supp. 2d at 1322 (internal references omitted).

The Court finds that Orphan gave the consent freely and voluntarily. Here, as in United States v. Romero, there were multiple officers at 1301 Pear Grove at the time that Barahona asked for and received Orphan's consent to enter the residence.  Additionally, the Court in United States v. Romero found that the professional conduct, and lack of aggression in the officers' tone and language, carried weight over the third-party's testimony that the situation was "tense."  Orphan did not testify that the situation was relaxed here, but all officers who overheard Barahona's questioning of Orphan testified that Barahona's tone and language during his

-56-

questioning was normal -- not raised and he was not shouting, but direct and professional -- and Orphan never testified that the situation in which he gave his consent was "tense."   Notably, when asked how he felt, whether he felt "threatened," "happy," or "sad," he responded: "Definitely not happy.  I wasn't sad either. I was just compliant."  Feb. 5 Tr. at 97:23-98:1 (de la Garza, Orphan).  Orphan's response counsels in favor of finding that Barahona was professional in his conduct and tone in questioning Orphan, and that Orphan complied by volunteering answers to Barahona's questions.  Whereas the Court noted in United States v. Romero that the officers did not ask for nor retain the third-party's personal identification or papers, so here the officers did not ask for or retain Orphan's identification card or other documents.  Importantly, whereas in United States v. Romero the third-party was in the house when he consented, because Barahona questioned Orphan in the front yard, with Orphan leaning against an exterior chain-link fence, Orphan's consent was given in the open, in an area viewable by the public.  While Orphan's being handcuffed at the time that he consented cuts against finding that Orphan volunteered his consent, as it is likely Orphan did not feel free to leave, the short passage of time between officers entering the property and Orphan providing consent to Barahona balances out to some degree this fact.  Whereas the Tenth Circuit and the Supreme Court factor in the length of a person's detention for whether consent is voluntary, based on Dye's testimony that two to four minutes elapsed between the time that he entered the property and when he was back in the front yard, observing Barahona's fifteen to thirty seconds questioning of Orphan.  Detention for between two to five minutes does not suffice to weigh against finding Orphan's consent voluntarily given, but weighs instead in favor of finding adequate time to intelligently consent.  The Court therefore concludes that Orphan gave voluntary and intelligent consent to Barahona.

The Court also finds that the agents and officers involved in the search did not impliedly or expressly coerce Orphan's consent.  As Orphan admitted during direct examination that he did not feel mad, or threatened, but rather compliant and because there is no evidence that Barahona's questioning was unreasonably forceful or coercive in conduct, tone or language, Orphan's consent was not reasonably a product of an officer's express coercion.  The issue is thus whether there was implied coercion or duress.

Orphan was not, as Chavez contends, on his knees with his hands in the air when he gave consent.  Rather, having finished Orphan's pat-down, Barahona had allowed Orphan to stand, to move, and to sit down against the fence before he began to question Orphan.  Importantly, the time period from the officers to arrive on the scene, from Barahona to complete the pat-down, to move Orphan, and to obtain consent to enter the house to search for Chavez and Bosco, was about two and a half minutes and four and a half minutes.  This time period weighs in favor of finding that Orphan's consent was not given because of the officers' implied or express coercion.  On the long end, five minutes is not enough of a lapse of time to find that Orphan's detention coerced him to provide consent merely to be freed from the detention.  On the short end, given that the officers had allowed Orphan to stand and to move him, and allow him to sit down, and also given that the officers were no longer pointing their weapons at Orphan, two and a half minutes was long enough here for any shock effect the officers' pursuit of Crain or pat-down of Orphan had to wear off.  Moreover, the Court noted in United States v. Romero, the presence of five officers, without more, was insufficient for coercion; Barahona was the only officer questioning Orphan here.  While Kepf and Martin were nearby during the questioning, Martin was watching the windows and doors from in front of Barahona, Kepf was watching another

subject while listening to the conversation from about six to ten feet from Barahona. Thus, whereas five officers questioned the third-party in United States v. Romero, only one officer questioned Orphan here. Finally, although there is no testimony that the officers advised Orphan he could refuse to give the officers consent to go inside and look for Chavez and Bosco, "the Supreme Court has clearly held that agents need not advise an individual of his or her right to refuse to consent to a search for that individual's consent to be valid." United States v. Romero, 743 F. Supp. 2d at 1322. Given that Barahona was the only officer questioning Orphan, that two and a half, to four and half minutes, had passed since the officers arrived at 1301 Pear Grove when Orphan gave consent, it is unlikely that any coercion or duress that might have been initially present when officers pointed guns at Orphan because he ran, had worn off.

The circumstances surrounding the questioning also counsel against finding coercion or duress. Importantly, all of the officers' accounts of Barahona's questioning of Orphan, when he obtained the consent, show that Barahona's conduct was professional and that he used a normal, direct tone. Importantly, Orphan's testimony supports such a conclusion. Orphan testified that he was not emotional at the time of questioning, but rather compliant. He also testified that, in addition to telling Barahona that Bosco and Chavez were inside, he was calm enough to tell the officers his relationship to both Chavez and Bosco. See Feb. 5 Tr. at 103:14-17 (Orphan)("[T]hey asked me who else was inside, and I told them Erica and Robert, and they asked me who Erica and Robert were and I told them the relationship of Erica and Robert."). Such an exchange does not support that the questioning was tense, and weighs against any contention that it was coercive or that Orphan felt under duress, rather than, as he stated, compliant. The Court thus finds that the officers did not use any implied or express coercion or

duress to obtain Orphan's consent. Orphan thus freely and voluntarily gave consent to search 1301 Pear Grove, which search resulted in Chavez giving to consent to search for the firearm.

### C.   ORPHAN HAD APPARENT AUTHORITY TO CONSENT.

Chavez contends that the United States cannot show that Orphan entered the premises or room at will, and without Chavez' consent, and, therefore, cannot prove that Orphan had actual authority to consent to the officers' search of the residence.  Chavez is correct.  As the United States correctly conceded at the hearing, the evidence is insufficient to meet its burden to show that Orphan had the authority to grant consent to enter.   See Feb. 6 Tr. at 165:7-10 (Rowley)("[W]e recognize that [we] do not [] have sufficient evidence of actual authority . . . .").

### 1.   Orphan Did not have Actual Authority.

The evidence establishes that Orphan did not have actual authority to consent to the search of Chavez' residence, because he did not have either joint access to or control over the property.  The government bears the burden of establishing that one who consented to the search of a property had actual authority to do so.  See Illinois v. Rodriguez, 497 U.S. at 181).  A "third-party's mere presence on the premises to be searched is not sufficient to establish that a man of reasonable caution would believe that she had mutual use of the property by virtue of joint access, or control for most purposes over it."  United States v. Cos, 498 F.3d at 1129 (quoting United States v. Rith, 164 F.3d at 1329).  "[A] third party has [actual] authority to consent to a search of property if that third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it."  United States v. Cos, 498 F.3d at  1126 (quoting United States v. Rith, 164 F.3d at 1329).  There is ample evidence -- such as Orphan's testimony that he stayed at Chavez' home off and on for three months, and that he kept clothes

-60-

there -- from which the Court can conclude that Orphan's connection with the home goes beyond that of a mere occasional visitor to an apartment.  See United States v. Cos, 498 F.3d at 1126 ("We have declined . . . to find mutual use by an occasional visitor to an apartment. . . .")(citing United States v. Sanchez, 608 F.3d at). The Tenth Circuit, however, requires specifically that "the government to show that the third party entered the premises or room at will, without the consent of the subject of the search."  United States v. Cos, 498 F.3d at 1125-1126.  Orphan's testimony, which was undisputed on this part at the suppression hearing, was that Orphan stored a few articles of clothing only there, but did not store other possessions.  Additionally, he testified that he did not have a key to the premises, did not pay rent, and that there was no lease agreement or other similar formal living arrangement in place.  Most importantly, Orphan did not have free access to the property, but had to call and make sure that someone else was there before entering. See Feb. 5 Tr. at 94:12-14 (de la Garza, Orphan)(Q: "Could you go to the residence a[t] anytime you wanted to?" A: "No. We had to make arrangement with Robert and make [sure] he was there."); id. at 96:2-6 (de la Garza, Orphan)(Q: "Did you have the ability to go pretty much at your leisure or when you wished to [Chavez'] property?" A: "Not without consent from Robert.  Robert had to be there or sometimes [P]age would be there, and if we could call ahead and make sure someone was there then we were able to go there.").  The Court finds, therefore, that Orphan did not have the actual authority to consent to the officers' entry of Chavez' residence to look for Chavez and Bosco inside.

### 2.    **Orphan Had Apparent Authority.**

Orphan had the apparent authority to consent to the search of Chavez' residence. "Officers . . . are not at liberty to rely an apparent authority when ambiguous facts related to

authority are present." United States v. Romero, 743 F. Supp. 2d at 1304 (quoting United States v. Kimoana, 383 F.3d 1215, 1222 (10th Cir. 2004)).  Where it is at all ambiguous whether the party allegedly giving consent has the authority to do so, "agents are required to investigate further before relying on the consent on the government will have failed to meet its burden to demonstrate apparent authority." United States v. Cos, 498 F.3d at 1129.  As Professor LaFave has observed, "sometimes the facts known by the police cry out for further inquiry, and when this is the case it is not reasonable for the police to proceed on the theory that "ignorance is bliss.'" W. LaFave, supra, § 8.3(g), at 180.  This is not the case here, however.

Starting from the beginning of the encounter, first, when officers identified themselves to Crain and Orphan in the driveway, while Crain ran behind the house and out into the street, Orphan took several steps towards the open front door.  While two people running in opposite directions might not have value otherwise, when one runs into a house with an open front door, it makes likely that the person running to the house lives there, has free access to the house, and does not need anyone's permission to go inside..

Second, when Orphan stopped before entering, and after his pat-down by Barahona, when Barahona asked where he lived, Orphan indicated that he lived in the home.  Moreover, Barahona testified that he clarified, because Orphan pointed to the house with his head the first time, by asking Orphan a second time, and particularly, "you live here?"  To which Orphan responded yes, and that he had been living there for three or four months.  Barahona, at the suppression hearing, provided the following:

> I asked Mr. Orphan where he lived.  He pointed towards the porch [] area and also the trailer.  I asked him again do you live here?  He stated yes, sir.  I asked him about [] how long he's been living there, and Mr. Orphan stated that he's been living there for about three months.

Feb. 5 Tr. at 59:19-21 (Barahona).  See id. at 99:5-12 (Rowley, Orphan)(Q: "Were you ever asked if you were a resident[] of that property?"  A: "They asked me if I lived there, I told him I had been staying there off and on for the previous three or four months . . . .").  In addition to Orphan confirming Barahona's testimony on at least this part of his testimony, Officer Martin testified that Orphan stated that he lived there and had lived there for three months.  See Feb. 5 Tr. at 9:15-22 (Martin)("[Barahona] was . . . asking him . . . where do you live? . . . [Orphan] told him he lived here.  He also said how long have you lived here approximately . . . .  Orphan told him that he had been there for three months . . . .").  Notably both Kepf and Martin testified that Orphan said he was staying in the back room of the home with his "girlfriend."  Feb. 6 Tr. at 9:21-22 (Martin)("[Orphan] had told him . . . that he was living there with his girlfriend and[] occupied a room in the house."); id. at 63:1-3 (Rowley, Kepf)(Kepf testifying that Orphan told Barahona that "he live[s] in the back room with my girlfriend").  When asked where one lives and to point in the direction of a home, even when standing right in front of it, might somehow be ambiguous, but to be asked a second time and verbally confirm yes makes ambiguity much less likely.  For Orphan to then tell Barahona that he had been living there for three or four months, and point to a room, is not ambiguous.  For Orphan to then tell Barahona that he lives there with his girlfriend, from an objective standpoint, cannot reasonably be seen as ambiguous whether Orphan lived in the home.  Thus, while the Court has previously noted that "[o]fficers . . . are not at liberty to rely an apparent authority when ambiguous facts related to authority are present," United States v. Romero, 743 F. Supp. 2d at 1304, the Court does not find any ambiguity in Orphan's conduct of language when discussing with Barahona whether he lives in the home.

-63-

For third-party consent to pass Fourth Amendment scrutiny, the United States must prove only that the officers' belief that Orphan had authority to consent was reasonable. See United States v. Sanchez, 608 F.3d at 689 ("Apparent authority arises from the reasonable, albeit erroneous, belief that the third party has the authority to provide valid consent."); United States v. Cos, 498 F.3d at 1128 ("The apparent authority inquiry is an objective one: we must determine whether 'the facts available to the officer at the moment . . . warrant a man of reasonable caution [to believe] that the consenting [individual] had authority over the premises[.]'")(quoting Illinois v. Rodriguez, 497 U.S. at 188). The lack of ambiguity from Orphan's statements to Barahona, and from his conduct at the scene and during questioning, underscores the reasonableness of the officers' belief that Orphan lived in the home at 1301 Pear Grove Lane. Specifically, it shows that it was objectively reasonable for the officers to believe his statements that he lived in the back room with his girlfriend, and that he had been living there for three or four months, and it was objectively reasonable for the officers to thus believe that Orphan had mutual use of the property and control over it for most purposes. See United States v. Cos, 498 F.3d at 1128 (noting that a third party has apparent authority "if the officer has a reasonable belief that the third party has '(1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it.'")(quoting United States v. Rith, 164 F.3d at 1329). It is important to recognize what this situation is not. This situation is not one in which police came to the door of a residence and found a person who was obviously a baby-sitter answering the door, and relied on her consent to enter and search the residence. See W. LaFave, supra, § 8.3(g), at 177 ("It is a perversion of the apparent authority doctrine . . . to hold that police may reasonably conclude that a person known to be a babysitter 'had the authority' to permit a full search of the premises

-64-

'which she purported to have.'"").  Rather, the police were executing arrest warrants for known

gang members.  They were doing so at a house with which the FPD were familiar with as having

been the subject of multiple calls and police interactions in the past.  See Feb. 5 Tr. at 41:5-42:24

(Rowley, Spruell)(testifying that Spruell is familiar with 1301 Pear Grove from having been

called there "several times" and "contacting either people who are affiliated with narcotic use,

selling drugs," and that he does not "always contact the same people at that residence").

Moreover, the subject they caught running from police, into the house in which he later gave

them permission to enter, based on appearances during Barahona's questioning, appeared to have

had "prior contacts with law enforcement."   Feb. 6 Tr. at 10:10-11 (Martin).   Objectively,

therefore, it appeared as though the officers had arrived upon a scene with individuals with

outstanding search warrants, who were running from police, and one of whom, who told them

that he lived in the back room with his girlfriend, gave his consent to search what reasonably

appeared to be his home, at least mutually with others.  The Court thus finds that Orphan's third-

party consent given to the officers to search Chavez' home for Chavez and Bosco was given

pursuant to his apparent authority to do so, and the officers' entry into the home, which relied on

Orphan's consent, was therefore lawful.

The Court could always fault law enforcement officers for not asking more questions.

But more questions are needed only when there is ambiguity.  Given Orphan's conduct and

status, which the court credits, there was neither ambiguity nor need for further officer inquiry.

In conclusion, the warrantless entry into Chavez' residence was legal under the Fourth

Amendment, and thus the Court does not require the Court to suppress any evidence seized or

statements made after the entry.  Because entry into Chavez' residence was legal pursuant to

Orphan's consent, the Court need not determine whether Chavez' consenting to the officers' search of his room broke the chain of any taint that the original entry might have had on their discovery of the evidence, or whether the Crain's arrest on outstanding warrants provided the officers the ability to do a protective sweep of the property, including making entry into Chavez' home.

**IT IS ORDERED** that the Defendant's Motion to Suppress Illegally Acquired Evidence and Memorandum in Support of Motion to Dismiss, filed December 21, 2012 (Doc. 28), is denied.

_____
UNITED STATES DISTRICT JUDGE

_Counsel:_

Kenneth J. Gonzales
    United States Attorney
William Pflugrath
    Assistant United States Attorney
Adam Rowley
    Special Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

          _Attorneys for the Plaintiff_

Henry Edward de la Garza
Albuquerque, New Mexico

          _Attorney for the Defendant_